**Jack Kent COOKE and California Sports, Inc., Plaintiffs,**

v.

**TELEPROMPTER CORPORATION et al., Defendants.**

No. 71 Civ. 4625.

United States District Court, S. D. New York.

Nov. 23, 1971.

**468**

Michael Roth, Leonard Gubar, J. Edward Meyer, III, Clark J. Gurney, Roth, Carlson, Kurt, Spengler & Goodell, New York City, for plaintiffs.

Robert W. Sweet, David S. Dubin, Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants.

### DECISION

BRIEANT, District Judge.

On October 20, 1971, in a proceeding in this Court (United States of America v. Deardorff, et al., 71 Cr. 1048), a jury, after trial, found defendant Irving B. Kahn and Teleprompter Corporation ("TPT") guilty of conspiracy to bribe and three counts of bribery. It also found Kahn guilty of one count of perjury in connection with testimony before a Grand Jury. The bribery is alleged to have occurred in connection with obtaining franchises, permits or privileges for the benefit of TPT from municipal officials at Johnstown, Pennsylvania.

Sentencing is presently scheduled for November 30, 1971 and accordingly, no judgment of conviction has as yet been entered. We are advised that following sentencing, an appeal will be taken.

Further, Kahn and TPT have been named as co-conspirators but not as defendants in an indictment presently pending trial in Mercer County, New Jersey. It is claimed in the Mercer County proceedings that public officials demanded and received money in exchange for official votes in connection with the award to TPT of a municipal franchise.

Two days following the coming in of the jury verdict in this Court, on October 22, 1971, plaintiff Cooke filed his original complaint (since amended once and supplemented once) based on diversity jurisdiction, seeking the removal of defendant Kahn as a director and officer of TPT, the further adjournment of the TPT Adjourned Annual Meeting, then scheduled for October 22, 1971, and an injunction to restrain the individual defendants from voting management proxies received as a result of prior solicitations, and intended to be used to re-elect the incumbent directors, including Kahn, and for other relief. California Sports, Inc. ("CSI") has since joined as a plaintiff. It is a TPT shareholder owned or controlled by Cooke.

On October 22, 1971, plaintiff applied to this Court (Gurfein, J.) for an Order to Show cause, with a temporary restraining order to prevent the holding on that day, of the adjourned Annual Meeting. Since much emphasis has been placed, by both sides, on what took place before Judge Gurfein, his determination is quoted in full:

"An agreement has now been reached between the parties which the Court is glad to confirm as follows:

The shareholders' meeting called for this afternoon will be adjourned this afternoon until November 24th with the understanding that notice will be given by means of proxy materials to

the shareholders concerning the recent conviction.

As to the suggestion by counsel for the plaintiff that the proxy notice should not permit the voting of old proxies, unless revoked, that is a matter which is not within the jurisdiction of the Court now because there are not sufficient facts upon which to form a judgment and because it is essentially an administrative matter that should be first determined by the Securities & Exchange Commission.

Senator Goodell, representing the plaintiff, has also stated in court that at the time he brought the restraining order he had not been informed of the action to adjourn the meeting."

TPT, a New York corporation is the largest operator of cable television facilities in the United States. It serves more than a half million subscribers with cable television pursuant to franchises obtained from local governmental units, such as Johnstown, Pennsylvania. Its operations are regulated to some extent by the Federal Communications Commission, which, however, has no authority over the award of local franchises. It has outstanding over 3,000,000 shares of stock, of which two-thirds are registered shares, and publicly traded.

Defendant Kahn, until recently Chairman of the Board and Chief Executive Officer, owns 34,070 shares in his own right. Other shareholders had committed their voting rights to Kahn with the result that in addition to his own shares he now claims the power to vote 256,070 shares, or approximately 8.2% of the shares now outstanding. Plaintiff Cooke owns 465,648 shares, and controls 45,000 additional shares belonging to plaintiff CSI, 500,000 shares of which were subject to the voting control of defendant Kahn, until his resignation on November 12, 1971. This amounts to over 16% of TPT's outstanding shares.

On November 1, 1971, plaintiffs brought on a motion by Show Cause Order for a preliminary injunction. This motion, originally returnable November 9th and thereafter by Stipulation adjourned until November 12th, sought a preliminary injunction pending trial which would (1) restrain TPT from holding the adjourned Annual Meeting of Shareholders until further order of the Court; (2) restrain the individual defendants from voting proxies heretofore solicited at the adjourned Annual Meeting or any adjournments thereof; and (3) enjoin defendant Kahn from holding any office in, or acting in any way as an officer and director of TPT during the pendency of the action.

On the first hearing before this Court on November 4, 1971, counsel for defendants proposed that defendant Kahn resign (without prejudice) until the resolution of the criminal charges against him or the determination of this action. This appeared to the Court to be a reasonable solution of the problem, and by resigning, Kahn, under the voting agreement, would automatically lose his right to vote Cooke's shares. Plaintiffs had previously advised the Court by affidavit as follows:

"* * * Cooke believes that a proxy fight will only injure TPT * * * his sole desire is to have Kahn removed from office * * * if Kahn is removed as an officer and director of TPT (as a result of which the voting agreement will automatically terminate) Cooke will not launch or participate in a proxy fight."

Notices and Proxy Statements for the adjourned Annual Meeting at which directors were to be elected were mailed to the shareholders in September, 1971. August 18, 1971 was the record date to determine those shares entitled to vote. The Meeting convened and matters other than the election of directors were concluded. The Board, on its own motion, adjourned the election of directors and issued a notice of an adjourned meeting dated October 14, 1971 fixing October 22, 1971 as the date for such election.

Subsequent to the hearing before Judge Gurfein on October 22, 1971 and the jury verdict in the criminal action on October 20th, a further letter was

sent to the shareholders dated October 29, 1971. This notice advised the shareholders, among other things, that "the Corporation and Mr. Kahn plan vigorously to oppose this action" (action by Cooke to have Kahn removed as director and officer). The meeting, then scheduled for November 24th, has since been adjourned further, on managements' own motion, until November 30, 1971.

The Court has read the proxy solicitation materials of October 14 and 29th and November 16, 1971. Viewed from the present point in time and enjoying all knowledge acquired after the fact, these statements do not appear complete and as fully informative as the extensive papers filed by both sides in connection with this motion have been. The exposition of facts, while not untruthful *per se*, is somewhat slanted and one-sided, and the Court finds that if others, including Cooke, are placed in a position to communicate with the shareholders, the shareholders may well view the matters referred to in a different context and may or may not conclude to re-elect the management slate. Concepts of corporate democracy and self-determination by the shareholders are at stake in this action.

As set forth in the advice to shareholders of November 16, 1971, events of a material nature have occurred and indeed are occurring still. Kahn has resigned as a director and Chief Executive Officer and Cooke has become released from the voting agreement so that he may now vote his own shares as well as those of CSI. The By-Laws have been amended to reduce the number of directors. These are factual matters which should be of interest to the shareholders, and are matters with respect to which they should have sufficient opportunity to deliberate and consider, prior to voting for the election of directors. Plaintiff Cooke has, by his conduct, placed himself in an unusual situation where, were his own personal interests solely involved, the Court would have no hesitancy to find that his right to a further adjournment of the Annual Meeting of Shareholders would be barred by laches, and he would be estopped by his conduct in this litigation from asking relief from a Court of Equity.

In brief, Cooke now asks the Court to adjourn the Annual Meeting for 60 days so that he might have sufficient time to prepare and wage a proxy contest. He previously had advised the Court by affidavit that if Kahn were out of office his interest in a proxy contest would end. He demanded Kahn resign, and Kahn did so. Having obtained that which he sought and that which he stated as the goal of his litigation he would ordinarily not now be permitted to reverse his position and evade his representation to the Court that Kahn's resignation would obviate a proxy contest, by seeking the aid of a Court of Equity to obtain a further adjournment of a Meeting of the Shareholders of the Corporation.

However, there are facts which tend to mitigate the claim of laches and to explain the apparent vacilation by Cooke.

Kahn has resigned, but in doing so he (or TPT) has effected a decrease in the Board of Directors, by an amendment to the By-Laws, from 12 to 11 members. It is not contradicted that he retains his full time employment at TPT with the same office space, salary, stock options, other emoluments, privileges and indicia of a Chief Executive Officer. His salary is said to be in excess of $100,000.00. The suggestion is made, (affidavit of Michael Roth, sworn to November 16, 1971) that Kahn intends to be the *eminence grise* of TPT, and only by the shareholders' choice of a new slate of directors can his continued domination of TPT be avoided. There may be some factual justification for the inference that Kahn's "resignation" may be a resignation in name only.

The independent shareholders may well conclude that it is inappropriate for a publicly held corporation, which must deal on an almost daily basis with municipal officials in connection with the awarding and administration of franchises for cable television to be controlled directly or indirectly by a person whom a

jury has found guilty of bribing such officials. Those officials referred to enjoy a vast and unfettered discretion to make decisions in favor of or against applicants such as TPT, not reviewable by any Court and not measured by any objective standard. Those who are honest and faithful to their public trust may have some reticence in dealing with a corporation which, together with its chief officer, has been convicted of such bribery and if there be any who are venal they may be tempted by knowledge of the conviction to exert extortionate pressures on TPT. At least the shareholders, or a majority of them, on being fully informed of all the circumstances, might so conclude, based on the reported public statements of a local official in Greenville, South Carolina, referred to in the affidavit of Michael Roth, sworn to November 1, 1971.

Eminent counsel, belonging to prominent law firms in the City of New York, have reviewed in detail the evidence presented at the criminal trial, and have expressed written opinions that there is a meritorious appeal which presumably would lead to a new trial which may or may not lead to acquittal. Concepts of corporate democracy do not make the conclusions of these experts binding on the shareholders.

The Court finds that undue emphasis, to the point of being misleading, has been placed on these opinions of counsel in the solicitation material heretofore sent by management to the shareholders of TPT. For example, the Board told the shareholders in its November 16, 1971 supplement:

"At the same time the Board (of Directors of TPT) reiterated its previously stated support of Mr. Kahn and its confidence that both he and the Corporation *ultimately will be vindicated through Appellate determination* of the issues in United States of America v. J. Howard Deardorff, et al." (Italics Added)

This is somewhat illusory, since the Appellate determination can only, as viewed by this Court, (a) reverse the judgment of conviction and grant defendants a new trial by reason of a claimed defect in the Court's charge to the jury, which is part of the basis of the appeal, or (b) reverse the judgment of conviction and dismiss the indictment on the ground that the facts do not show a *federal* crime committed within the jurisdiction of this Court. Such appeal will leave defendants in a position where either (1) they will have a new trial in this Court with the charge to the jury modified in such manner as the Court of Appeals may direct, or (2) they will remain subject to prosecution for the Johnstown incident, in State Court, or wherever the Court of Appeals may ultimately determine jurisdiction to lie.

Furthermore, in a civil action to disqualify a director (B.C.L. Sec. 706 (d)), the quantum of proof will be less than that required to obtain a criminal conviction. Plaintiffs, or a shareholder having 10% or more of the shares, can litigate the fitness of Kahn to serve as a corporate officer of TPT, wholly without regard to the outcome of the appellate proceedings. These possibilities have not been disclosed or fully explained to the shareholders.

It has been claimed by Cooke that because of the criminal conviction above noted, and the fact that Kahn has been named as a co-conspirator but not as a defendant in the Mercer County case "the Corporation's F.C.C. licenses may be subject to revocation and/or denial as to future applications". In this respect, too, the management proxy solicitation material of November 16, 1971 may be misleading. It refers to two separate firms of attorneys specializing in proceedings before the Federal Communications Commission and quotes these firms to the effect that "after careful consideration of the matter, the Corporation's licenses *generally* are not in jeopardy" (emphasis added). These learned counsel are said to believe "it is especially significant that the F.C. C. has issued five authorizations to the Corporation or its subsidiaries after being formally advised of the conviction.

Since being advised of the original indictment in January, 1971, the F.C.C. has issued a total of 75 radio authorizations to the Corporation, all of which have been made subject to the following condition:"

"This authorization is without prejudice to whatever action, if any, the Federal Communications Commission may deem appropriate as a result of the pending criminal action entitled United States v. J. Howard Deardorff * * *"

A jury found Kahn and the Corporation guilty. A Grand Jury in another place found Kahn and the Corporation as conspirators but did not indict them. The F.C.C. has made formal reservations concerning these facts, in grants of licenses. The record and the jury verdict are sufficient to render not unreasonable a decision by the shareholders or a majority of them that a change in management should be effected, at least pending the outcome of the criminal litigation. The possibility remains that Kahn will be restored to all of his voting rights and prestige of office if ultimately exonerated.

The position of the present Board nominees is adequately stated by one of the incumbents who is a nominee on the management slate for re-election. He has advised this Court under oath that:

"The Board was also convinced that the facts presented at the trial made it abundantly clear that any monies paid by Kahn because of extortionate demands were paid in furtherance of TPT interests, and that Kahn did not seek or realize any personal gain whatsoever from the Johnstown, Pennsylvania matter.

At our meeting of October 29, 1971, the Board fully considered Mr. Kahn's value to TPT. It was our consensus that Mr. Kahn was invaluable as the acknowledged leader of the CATV industry."

█ This seems to the Court, and might well seem to a majority of the public stockholders of TPT as evidencing a somewhat insensitive attitude toward the proper conduct of corporate affairs. A listed American corporation dealing with municipal officials is simply not supposed to submit to extortion. If threatened with extortion, an officer of the corporation should report the attempted crime to State or Federal authorities. No disclosure has been made as to how the money paid was shown on the books and records of TPT. Presumably, this can be developed by discovery in this action, but money paid as bribes or extortion payments to American public officials is not a legitimate corporate expense or deduction for income tax purposes (26 U.S.C. § 162(c)) and if these payments were charged off in some guise as a legitimate corporate expense, this is again a factor which the shareholder might wish to consider in reaching his conclusion as to who should control the corporation.

Cooke has stated that if permitted to solicit proxies, he proposes to serve as a director, but not as an officer or employee of TPT. The apparent attitude of the present directors may be explained by reason of their personal loyalty over some years, to Kahn, one of the founders of this extremely successful business, and possibly also may be excused because of apparent dislike or distrust of Cooke, who, we are told, has a reputation in the industry of being an "entrepreneur" (see affidavit of Hubert J. Schafly, dated November 8, 1971).

The agreement between Kahn and plaintiffs dated September 17, 1970, would seem to limit plaintiffs' voting rights, by requiring them to keep in force irrevocable proxies in favor of Kahn for a lengthy term of years. Fortuitously, by reason of the resignation of Kahn, this agreement is now not in effect, but it indicates that for reasons deemed adequate, TPT or Kahn bargained for a partial exclusion of Cooke from TPT management. This agreement was signed on the date that plaintiffs acquired their TPT stock by merger of H & B American Corp. ("H&B") into TPT. We are also told that a station controlled by Cooke

("KRLA") had engaged in fraudulent practices and alteration of its program logs, resulting in license revocation by the F.C.C. Cooke, however, was not convicted of any felony in connection therewith.

It is claimed that Cooke is capitalizing on the unfortunate occurrence with respect to Kahn to wrest corporate control from existing management to his own advantage and to the detriment of the Corporation, and that he has sought unfair advantage in the proxy contest, by delaying in announcing his intention, and by using this litigation as a basis for publicity adverse to TPT management and to gain information, relevant on the trial of this action, but also helpful in a proxy solicitation.

Whatever his qualifications or disqualifications, and without regard to his personal motives, whatever they may be, Cooke is in a sense the available vindicator of the rights and interests of the public shareholders of TPT. The Court believes plaintiffs should be granted a reasonable, limited opportunity to "go to the people" with Cooke's case for election of a different management of TPT. Cooke has already filed Form 14B with the Securities and Exchange Commission, and has nominated a slate of directors.

Kahn has resigned as an officer and director, so that branch of the motion relating to his removal is academic. It would not be appropriate at this time for the Court to require the Board under these circumstances to discharge Kahn as an employee under a contract which has many years to run. Such an issue should not be determined by preliminary injunction. Whether Kahn is or will be an *eminence grise* as charged by plaintiff, in the affairs of the Corporation, or as represented by defendants, merely an executive for whom the building of the Teleprompter system has been his life's work, who is devoting every hour of his day, not committed to defense of his own liberty, towards helping the executives carry on with the business of TPT with

which he is so familiar, is an issue which had best be decided by the shareholders and not by the Court. If he is acting as an *eminence grise*, this may be cured by electing a new Board, unless the shareholders are willing that he continue to do so, or are not convinced that he is doing so. Cooke and others should be permitted a reasonable time within which to argue the merits of this claim before the shareholders. A better solution would be the election of a "coalition slate" with fair representation of both sides of this controversy. The delay and expense, and adverse publicity cannot but damage TPT, and the uncertainty while this war is waged in the Courts and before the shareholders may disrupt TPT's relationships with its employees and delay its sales efforts. Also, there would thus be an orderly transition from the Kahn leadership. The Court has attempted to effectuate a compromise and settlement along these lines but has failed after considerable effort and lengthy discussions with counsel for both sides. There is some reason to believe that at least in part the impasse was caused by a belief on the part of Cooke that his likelihood of success in taking over TPT through a proxy contest is so great as to eliminate the need for compromise. If this is so it is regrettable.

A Court of Equity may, and should, postpone a shareholders meeting where the interests of justice would be served by allowing time for a shareholder to communicate to his fellow shareholders facts and circumstances, which if known, might result in a majority vote for a change in the Board of Directors. Studebaker v. Allied Prods., D.C., 256 F.Supp. 173; Union Pacific R. Co. v. Chicago and North Western Ry. Co., D.C., 226 F.Supp. 400; Steinberg v. American Bantam Car Co., D.C., 76 F.Supp. 426; J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423.

As heretofore noted, the Court considers the existing material for the solicitation of proxies previously sent out by management incomplete, slanted and

misleading in several respects. Several important issues, discussed *supra*, have been minimized unfairly. The only remedy for this is to allow free access to the marketplace of ideas by others who place these facts in a different context.

Plaintiffs would likewise have the Court enjoin the use of any proxies previously obtained. This is said to be necessitated by the "inertia" of some shareholders, who, having signed a proxy in September or earlier when the problems of TPT were not widely known, and before having heard from Cooke, are likely to leave their proxies in the state in which they presently stand. If they thought about it, so the argument goes, or if they were required to execute new proxies, they might act differently. A balancing of equities does not require the Court to accept this suggestion completely. The Court does believe, however, that proxies dated prior to October 21, 1971, the day following the conviction of Kahn and TPT in this Court, should not be voted at the adjourned Annual Meeting. Automatic judicial cancellation of proxies executed after that date would seem unnecessary, since persons signing on and after that date at least knew, or should have known, of the conviction. These persons may readily revoke their proxies, in writing, or merely by executing new proxies in favor of the insurgents.

The Court observes that more than three months have elapsed since August 18, 1971, the record date established by the Board of Directors to determine eligibility to vote at this meeting presently scheduled for November 30, 1971. Conceivably, persons who held shares on that date no longer have an interest in TPT and are unconcerned as to the results of the Meeting. We are told by letter from Cooke's counsel, not substantiated by any person having direct knowledge, or by affidavit, that there have been more than 1,000,000 shares of TPT traded on the American Stock Exchange since the record date. Obviously, some shares have been traded and some perhaps more than once. To proceed with the Meeting in the manner presently proposed would disenfranchise a number of shareholders (however many these may be) who acquired their shares after August 18th but who have a real and current interest in the outcome. The record date should be rescheduled closer to the date of voting. Union Pacific R. Co. v. Chicago & North Western Ry. Co., *supra*, and Studebaker v. Allied Prods., *supra*, are cases in which a Court of Equity has changed the record date in the interests of free and fair shareholder suffrage. Section 604, B.C.L., cannot be read to oust the Court of this power, and apparently the Directors could change the date after the Meeting had, as here, convened, transacted other business, and adjourned without electing directors. See McDonough v. Foundation Co., 7 Misc.2d 571, 155 N.Y.S.2d 67. The new record date should be such as to include within those entitled to vote, most, if not all who bought TPT stock prior to October 20, 1971.

The Court directs that the adjourned Annual Meeting be further adjourned to a business day to be determined by the Directors forthwith which shall be not less than 35 days nor more than 60 days after the date of the Order to be entered hereon, and that the shareholders who may vote at such adjourned meeting shall be those shareholders of record at the close of business on October 28, 1971. Management has given to plaintiffs its shareholders list of August 18th without the necessity of any judicial proceedings. The foregoing timetable has been fixed by the Court on the assumption that a shareholders list as of the new record date may be furnished to both factions within five days following the signing of the Order. Jurisdiction is reserved for the purpose of enlarging the time if necessary by reason of delay in obtaining the list and for the granting of any other or further relief which may become necessary to implement the foregoing decision.

Settle Order on three days notice.