UNITED STATES of America

v.

Irving GOLDMAN, Defendant.

No. 75 Cr. 337.

United States District Court,
S. D. New York.

June 27, 1977.

See also, D.C., 439 F.Supp. 352.

Robert B. Fiske, Jr., U. S. Atty., for government, New York City, by Bart M. Schwartz, Robert J. Costello, James P. Lavin, Asst. U. S. Attys., New York City, of counsel.

Tanner & Friedman, New York City, by Arthur S. Friedman, Peter N. Wang, New York City, of counsel, Millard & Greene, New York City, by Myron J. Greene, New York City, of counsel, for defendant.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Defendant Irving Goldman moves to dismiss the indictment, requests discovery and inspection of certain items, and seeks a bill of particulars. In order to understand the basis for these motions, it is necessary to outline the indictment.

Count 1 alleges a conspiracy between Goldman, Jack Zander, an unindicted co-conspirator, and others from January 1, 1967 to the date of the indictment with three objects: to defraud the New York City Transit Authority ("Transit Authority"); to defraud Interborough News Company, Inc. ("Interborough") and, to defraud the United States, the Internal Revenue Service ("IRS") and the Treasury Department. Specifically, he is charged with conspiring to violate the mail fraud provision, 18 U.S.C. § 1341 and the prohibition against

false income tax returns, 26 U.S.C. § 7206(1). The indictment alleges that Goldman was president and chief operating officer of Jola Candy, Inc. ("Jola") from January 8, 1975 until the indictment, and vice-president and a director of Interborough from October 1967 to September 1973. Zander became president of Interborough on March 8, 1967 and president of Interborough's parent corporation, Sportservice Corporation ("Sportservice") in January 1973; he left both positions on March 3, 1975.

The indictment charges that the following means were used to accomplish the first object of the conspiracy, the fraud against the Transit Authority: Goldman prepared three false Jola invoices in the amounts of $7,500, $750 and $750, and caused them to be mailed to Zander at Interborough News in Buffalo; thereafter, Zander caused checks to be drawn on Sportservice payable to Jola and mailed to Jola. Goldman then allegedly caused checks to be drawn on the Jola bank account and to be negotiated in order to pay Seymour Wasserberger, who was at the time Director of Concessions, New York City Transit Authority.

The second object of the conspiracy, defrauding Interborough, was allegedly accomplished as follows: Interborough, during the time of the conspiracy, was under contract with the Transit Authority and supplied vending machine products for placement and sale in vending machines located within the subway system. Zander caused Interborough employees to order products directly from manufacturers and suppliers, and have the products delivered to Interborough's New York office, but the bills and invoices for the products were sent to Jola rather than Interborough. Thereafter, Goldman would have Jola mail invoices to Interborough charging inflated prices for the products or charging Interborough for merchandise which Interborough had received for free from manufacturers and suppliers. The Jola invoices were then paid by Interborough's parent, Sportservice, and mailed to Jola; Goldman had checks drawn on Jola in the approximate amount of $200,000 payable to his daughters, Joy and Laurie, and to Zander's children, Brian and

Robin; these checks were then negotiated. It is further charged that Goldman and Zander concealed Zander's interest in Jola from Interborough and Sportservice.

The fraud upon the United States was allegedly accomplished through false income and expense entries on the books of Jola, upon which entries false federal corporate income tax returns were filed. Specifically, the indictment asserts that Goldman filed false United States Small Business Corporation Income Tax Returns (Form 1120) for the years ending January 31, 1971, January 31, 1972, and January 31, 1973. The indictment recites the amount of gross receipts and sales and the amount of deductions reported for each year and charges that those amounts are false.

Nineteen overt acts are alleged in furtherance of the conspiracy. Among them are a December 18, 1970 conversation between Goldman and Zander in which a $5,000 payment to Wasserberger was discussed for Wasserberger's assistance in renegotiating Interborough's contract with the Transit Authority, and December 1971 and January 1973 conversations between Goldman and Zander in which $500 payments to Wasserberger were discussed.

Counts 2 through 44 charge separate counts of mail fraud. Each count represents the mailing of one or more checks or invoices; in each instance the date of mailing, the addressee, and a brief description of the contents is set forth.

## I. THE MOTIONS TO DISMISS

Goldman moves to dismiss Count 1 on the ground that it fails to allege a conspiracy to commit either mail fraud or tax fraud. He moves to dismiss Counts 8–16 on the ground that the mailings occurred after the completion of the alleged fraud and to dismiss Count 17 as barred by the statute of limitations. Goldman further urges that various state indictments against him are so similar to the federal indictment that the latter should be dismissed or stayed pending the outcome of the state cases. As a final ground for dismissal, he alleges prosecutorial misconduct.

A. *Conspiracy to commit mail fraud*

The mail fraud provision, 18 U.S.C. § 1341 provides as follows:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Post Office Department, . . . shall be fined not more than $1,000 or imprisoned not more than five years, or both."

Goldman asserts that the conduct alleged in the indictment does not fall within the ambit of the statute because there was no "scheme to defraud." His counsel's argument is best summarized in his own words: "Surely, if Wasserberger was the one who was 'bribed'—and the Bill of Particulars asserts that he allegedly received monies—*he* was not defrauded. And to say that Wasserberger's 'employer,' the Transit Authority, was 'defrauded' by his being bribed is certainly extending the definition of 'defraud' into areas far beyond its ordinary situs." (emphasis in original) (Defendant's Memorandum of Law at 7–8).

The term "scheme to defraud" as used in Section 1341 is not intended to convey any technical meaning; it simply requires a plan "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Silverman v. United States,* 213 F.2d 405, 407 (5th Cir. 1954); *see Gusow v. United States,* 347 F.2d 755 (10th Cir. 1965), *cert. denied* 382 U.S. 906, 86 S.Ct. 243, 15 L.Ed.2d 159 (1965). To adopt defendant's reasoning would be to countenance all manner of frauds on governmental and private entities whenever a responsible agent or employee of the entity participated in the fraud. Defendant's argument sidesteps the allegation of the indictment that the Transit Authority, not Wasserberger, was the object of the fraud. Moreover, defendant's narrow reading of Section 1341 is not supported by precedent. *See United States v.*

*Bush,* 522 F.2d 641 (7th Cir. 1975), *cert. denied,* 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976) (concealment by city official of interest in advertising and use of official influence to obtain contract for agency); *United States v. Keane,* 522 F.2d 534 (7th Cir. 1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976) (city alderman's intentional concealment of personal interest in property sold to him by county); *United States v. Issacs,* 493 F.2d 1124 (7th Cir.), *cert. denied, Kerner v. United States,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1974) (bribery of governor); *United States v. States,* 488 F.2d 761 (8th Cir. 1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974) (vote fraud scheme by candidate for city office). *But see United States v. McNeive,* 536 F.2d 1245, 1251 (8th Cir. 1976) ("acceptance of small unsolicited gratuities" by city inspector does not violate Section 1341).

Counsel for the defendant further argues that there was no scheme to defraud Interborough since Jola Candy merely performed legitimate middleman functions. At trial, counsel's view of the case may well prevail. At this stage, however, the Court's duty is to determine whether the indictment properly alleges a crime. The allegations that Goldman caused the mailing of Jola invoices to Interborough which charged "inflated and excessive prices" and charged for merchandise which Interborough received free of charge from suppliers, when coupled with the allegations that Goldman and Zander concealed from Interborough and Sportservice Zander's interest in the Jola profits, is sufficient to withstand a motion to dismiss.

The defense argues that even were this Court to find that a scheme to defraud is alleged, the indictment must be dismissed because the mails were not used "for the purpose of executing such scheme." Any mailings, it is argued, were tangentially, if at all, related to the scheme. However, the law does not require that the "scheme contemplate the use of the mails as an essential element," *United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 648, 38 L.Ed.2d 603

(1974) quoting *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954). In any event, the indictment charges more than a casual and incidental use of the mails; since the alleged fraud against Interborough encompassed a concealment of Zander's true affiliation with Jola, the use of the mails to deliver the three Jola invoices to Interborough and to mail the Sportservice payments to Jola could reasonably have contributed to the appearance of arms length dealings. Thus, the allegations are sufficient, even under a narrow reading of the statute, to withstand a motion to dismiss.

**B. *Conspiracy to violate the tax laws***

 Goldman has been charged with conspiring to violate 26 U.S.C. § 7206(1) which provides as follows:

"Any person who—

(1) . . . Willfully makes and subscribes any return, statement or other document, which contains or is verified by a written declaration that it is made under penalties of perjury, and which he does not believe to be true and correct as to every material matter; . . .

shall be guilty of a felony . . . ."

The defendant urges dismissal on the ground that any misstatements contained in the three tax returns resulted in an overpayment of taxes and, therefore, were not material. The government disagrees with defendant's interpretation of Section 7206(1) and argues that not only did the allegedly false invoices result in overstatement of income but also the alleged bribes were deducted as business expenses.

Although there does not appear to be a universally accepted definition of materiality, *compare United States v. Romanow,* 509 F.2d 26, 28 (1st Cir. 1975) *with United States v. DiVarco,* 343 F.Supp. 101 (N.D.Ill. 1972), *aff'd,* 484 F.2d 670 (7th Cir. 1973), *cert. denied,* 415 U.S. 916, 94 S.Ct. 1412, 39 L.Ed.2d 470 (1974), the cited authorities do suggest that a statement is material if it is capable of influencing actions of the IRS in any matter within its jurisdiction. The question then is whether overstatement of income is a material matter. The accuracy of items of taxable income reported on the return of one individual or entity may affect the ability of the IRS to assess the tax liability of another taxpayer. Furthermore, overstated income may shield from scrutiny falsely inflated deductions. Thus, an overstatement of income impairs the ability of the IRS to determine if the correct amount of tax has been paid. *United States v. DiVarco,* 343 F.Supp. at 103. The conclusion that an overstatement of income may result in a prosecution is buttressed by the Congressional determination to make Section 7206(1) a crime separate and apart from income tax evasion, 26 U.S.C. § 7201.

But this does not end the inquiry. In its request for a Bill of Particulars, the defense sought "the precise manner in which it is claimed that each Jola Federal corporate income tax return was 'false'." The government responded as follows:

"13(f). Gross receipts and gross sales improperly included amounts relected in the fraudulent invoices identified in paragraph 10 of the Indictment.

*Other deductions* improperly included amounts paid to Seymour Wasserberger."

(emphasis in original).

Paragraph 10, referred to in the Bill of Particulars, alleges that three false Jola invoices were mailed to Interborough and that Sportservice mailed payment to Jola. Thus, the indictment charges Goldman with conspiring to falsely state the amount of gross receipts by including the payments made by Sportservice.

It is elementary that gross income as defined in 26 U.S.C. § 61 includes the fruits of a crime. *See Rutkin v. United States,* 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833 (1952). As one court has observed:

"money received by a taxpayer in a manner which allows him freedom to dispose of it at will is taxable income even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it . . . ."

*Benes v. United States,* 276 F.2d 99, 105 (6th Cir. 1960). Thus, Jola's officers did not act unlawfully in reporting gross income from the Interborough-Sportservice transactions even though those transactions may have been fraudulent. Therefore, the government is precluded from attempting to prove a conspiracy to violate 26 U.S.C. § 7206(1) by the accurate reporting of income from the Interborough-Sportservice transaction on Jola's returns. Of course, the government is not precluded from proving that the income reported from the allegedly unlawful transactions was not, in fact, accurate.

Although illegal income is reportable, illegal payments or bribes are not deductible as business expenses, 26 U.S.C. § 162(c). *Cf. Cooke v. Teleprompter Corp.,* 334 F.Supp. 467, 472 (S.D.N.Y.1971). Thus the charge of conspiracy to violate Section 7206(1) by falsely claiming bribe payments as business deductions withstands the motion to dismiss.

### C. *Substantive counts of mail fraud*

 Each count 2 through 44 charges the substantive offense of mail fraud, 18 U.S.C. § 1341. The defendant now moves to dismiss counts 8 through 16 for failing to allege a crime and count 17 as barred by the statute of limitations.

Each of the mailings charged in counts 8 through 16 was addressed to Jack Zander and contained two Jola Candy checks. The defense argues that, assuming the government's theory of the case is correct, these mailings represent the proceeds of the fraud and were mailed after the fraud was completed. The defense relies on *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), to support this argument.

In *Maze* the defendant had fraudulently used a stolen credit card to obtain food and lodging at several motels. The defendant was charged with and convicted of mail fraud arising out of the subsequent mailings of the credit card invoices by the motel to the bank which had issued the card and from the bank to the rightful owner of the credit card. The court reasoned that these mailings were not a part of the scheme to defraud but actions taken after the fact:

> "the mailings here were directed to the end of adjusting accounts between the motel proprietor, the Louisville bank, and Meridith, [the credit card owner], all of whom had to a greater or lesser degree been the victims of respondent's scheme. Respondent's scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss. Indeed, from his point of view, he probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all."

414 U.S. at 402, 94 S.Ct. at 649 (footnote omitted).

Unlike *Maze* which was based upon mailings from victim to victim, this indictment charges mailings from one participant in the crime to another. The fraud in *Maze* was completed when the defendant received the goods and services from the motel operators; by analogy, the fraud charged in this indictment could not have been completed until co-conspirator Zander, then president of Interborough, received the Jola checks in the mail. Moreover, the mailings charged in counts 8 through 16 occurred from December 9, 1970 to March 10, 1973, yet the fraudulent scheme charged in count 1 continued from 1967 into 1975.

The motion to dismiss counts 8 through 16 is denied.

Defendant has also moved to dismiss count 17 as barred by the statute of limitations and the government does not oppose the motion. The motion to dismiss count 17 is granted.

### D. *Similarity of the state court indictments*

 Goldman has asserted that the federal indictment against him is so similar to state indictments (S.P.O. N–52/1975; S.P.O. N–78/1975) which have been pending against him that the federal indictment

should be dismissed or stayed pending the outcome of the state cases.

Both state indictments have since been dismissed on grounds relating to the jurisdiction of the prosecutor; accordingly, that portion of the motion which seeks a stay is now moot.

It is a well established jurisprudential principle that no right of a defendant is violated if two different sovereignties charge him with separate crimes arising out of the same set of facts. *See United States v. Lanza,* 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922); *Abbate v. United States,* 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959). Only when the same sovereign seeks to twice prosecute for the same offense does an issue of double jeopardy arise. The principle of dual sovereignty would permit a federal prosecution even where the state court prosecution was frustrated by a ruling adverse to the government. *United States v. Mejias,* 552 F.2d 435, 441 (2d Cir. 1977).

Considerations of comity and prosecutorial discretion frequently prompt federal enforcement officials to decline prosecution in favor of a state proceeding. *See* National Commission on Reform of the Federal Criminal Laws (1971) [proposed § 207]; Friendly, *Federal Jurisdiction: A General View* 60 (1973). But there is no rule of law mandating a deferral.

Even if this Court were vested with the discretion to dismiss the indictment on the ground of its similarity to the already dismissed state court indictment, it would be particularly inappropriate to do so. Justice Leonard H. Sandler, New York State Supreme Court, dismissed the second state court indictment because the Special Prosecutor, Maurice Nadjari, who had presented the case to the grand jury, had exceeded his lawful authority. In considering several remedies—dismissal of the indictment, permitting the New York County District Attorney to proceed with the case, or staying the case pending the determination of an appeal in a case raising the same issues— Justice Sandler emphasized the existence of the federal indictment and concluded that

dismissal was appropriate. Thus, considerations of comity are not adversely affected by proceeding with the trial of this case.

### E. *Prosecutorial Misconduct*

Four areas of prosecutorial misconduct are alleged in support of the motion to dismiss: (1) consultation by the government with employees of two corporations without notifying corporate counsel; (2) violation of grand jury secrecy by exchanging information with the state prosecutor; (3) the presentation of New York City Department of Investigation testimony to the grand jury; and (4) the questioning of Goldman before a grand jury.

 Counsel argues that the prosecutor should not have interviewed employees of two corporations with which Goldman is affiliated without first notifying corporate counsel and permitting him an opportunity to be present. Bypassing the serious standing problems which may well preclude Mr. Goldman from asserting this claim, there does not appear to be anything in the slightest way improper with these actions. There is no allegation that the two employees who spoke with government attorneys did not have the opportunity to consult with counsel and, in fact, the contrary appears true: each had conferred with private counsel. If government agents investigating criminal activity by a corporation or its officers were required to seek the approval of corporate counsel prior to interviewing employees, the administration of the criminal laws, particularly as they apply to white collar crimes, would be severely hampered. No constitutional right of the accused, the corporation, or the employee is violated by the government's action.

 Next, it is alleged that Rule 6(e), Fed.R.Crim.P., requiring grand jury secrecy, was violated by the exchange of grand jury evidence between the Office of the United States Attorney and the Office of the Special Prosecutor, State of New York. Rule 6(e) authorizes the disclosure of grand jury material "when so directed by the court preliminarily to or in connection with

a judicial proceeding . . . ." State judicial proceedings are encompassed by the rule. *See In re Special February 1971 Grand Jury*, 490 F.2d 894 (7th Cir. 1973); *Doe v. Rosenberry*, 255 F.2d 118 (2d Cir. 1958).

As far as the record indicates, the United States Attorney fully complied with the letter and spirit of Rule 6(e). On January 27, 1975, February 13, 1975, and March 6, 1975, orders were obtained from judges of this court authorizing the delivery of certain federal grand jury materials to the Special Prosecutor. These orders were sealed and have been handed up to me for *in camera* inspection. Each appears regular on its face and was supported by an affidavit explaining the nature and circumstances of the intended disclosure.

The defendant also complains that state grand jury material was unlawfully provided to the federal prosecutors. An order has been produced by the government for my inspection which was signed by the late John M. Murtagh, Justice of the New York Supreme Court, authorizing the disclosure of grand jury materials to the United States Attorney pursuant to New York Criminal Procedure Law § 190.25(4). Thus, Goldman's claim of unauthorized disclosure is wholly unsubstantiated.

 Defendant argues in his reply brief that the indictment ought to be dismissed because part of the materials handed over by the Special Prosecutor and presented to the federal grand jury included evidence which Goldman gave before the state grand jury, as a result of which he claims immunity under New York Criminal Procedure Law § 190.40(2). He argues that once it is established that the defendant was granted immunity, the government has the burden of demonstrating in independent legitimate source for the evidence presented to the grand jury. *See Kastigar v. United States*, 406 U.S. 441, 461, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Murphy v. Waterfront Commission*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

The government responds, and defendant's supplemental reply brief concedes, that Goldman never actually appeared before the state grand jury; rather, his attorneys supplied, pursuant to subpoenas, records relating to Jola Candy Co. and Gothic Color Co. Thus, Goldman's claim of immunity depends upon a legal conclusion, apparently never passed upon by a state court, that because of his submission of documents he was a "witness . . . in a grand jury proceeding" within the meaning of New York Criminal Procedure Law § 190.-40(2).[1]

But I find it unnecessary to pass upon the claim. Assuming *arguendo* that the materials produced were immunized, they were independently obtainable. There is no dispute that the materials produced by Goldman were corporate records. Prior to their production by the Special Prosecutor, the federal prosecutor had issued a subpoena for these items; however, the sequence of events was such that the records were first received from the state prosecutor. Since the material was not subject to a claim of Fifth Amendment privilege, *United States v. White*, 322 U.S. 694, 698, 64 S.Ct. 1248, 88 L.Ed.1542 (1944); *Rogers v. United States*, 340 U.S. 367, 371–72, 71 S.Ct. 438, 95 L.Ed. 344 (1951), the government has succeeded in "establishing that they had an independent, legitimate source for the disputed evidence." *Murphy v. Waterfront Commission*, 378 U.S. 52, 79, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1974).[2]

---

1. A July 24, 1975 amendment to Section 190.40 now makes it clear that a witness who merely produces corporate records before the grand jury receives no immunity. The amendment only applies to a "witness" before the grand jury and sheds no light on whether a person who produces evidence pursuant to subpoena falls within the term "witness."

2. In *United States v. Nemes*, 555 F.2d 51 (2d Cir. 1977) the government unsuccessfully sought to establish freedom from taint by means of a representation that the federal grand jury had not been presented with the immunized state grand jury testimony. The Court of Appeals ruled that a hearing was necessary because the immunized testimony could have been used as a lead to obtain other

Alternatively, Goldman argues that the state grand jury material should not have been presented to the federal grand jury because there has been a judicial determination that the state grand jury proceeded unlawfully. However, it is clear from the record that the state court indictments were dismissed because the Special Prosecutor exceeded his authority under Executive Order 55. Although the presence of the Special Prosecutor as an unauthorized person in the grand jury room rendered the indictment dismissible, it did not render the grand jury proceedings unlawful *ab initio*. In fact, Justice Sandler expressly authorized the New York County District Attorney to present the same evidence which supported the dismissed indictment to a new grand jury. But even if the state grand jury proceedings were fundamentally defective, the defect arose solely from matters of state procedure. Since no constitutional right was violated, it was not improper to present the material to a federal grand jury. *Cf. United States v. Culotta*, 413 F.2d 1343 (2d Cir. 1969), *cert. denied*, 396 U.S. 1019, 90 S.Ct. 586, 24 L.Ed.2d 510 (1970). Moreover, an indictment valid on its face will not be dismissed solely because the grand jury considered some illegal evidence, *United States v. Calandra*, 414 U.S. 338, 344–45, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

Goldman urges that the indictment should be dismissed because his May 30, 1974 testimony before the New York City Department of Investigation in connection with his position as then Commissioner of Cultural Affairs for the City, should not have been presented to the grand jury. He argues that since the hearing was labelled "private," it was improper to have it used against him by a different governmental entity.

The hearing opened with Deputy Commissioner Edward Hammock of the Department of Investigation advising Goldman of his right to remain silent. He also advised Goldman:

"If you do elect to answer questions, anything you say to me in answer to those questions, can be used as evidence against you in a court of law. You have the right to consult with or have an attorney present. Mr. Friedman has already noted his appearance, and I assume he is your counsel; is that correct?

THE WITNESS: That is correct.

MR. FRIEDMAN: That is correct."

That the Department of Investigation chooses to avoid unwarranted damage to a person's reputation by not publicly disclosing the individual's testimony does not preclude its use before a grand jury. In light of the warning given to Mr. Goldman prior to his testimony, he could not reasonably have expected that his testimony would be exempt from scrutiny by other judicial bodies. It was, therefore, perfectly proper to present this evidence to the grand jury.

The final asserted ground for dismissal is that defendant Goldman was improperly questioned before a federal grand jury. He alleges that an agreement had been reached with his counsel whereby he would testify only as to the existence and location of the books and records of Jola but would invoke his privilege against self-incrimination as to other matters. Goldman did, in fact, testify before a grand jury on February 25, 1975 regarding corporate records but, at the conclusion of the testimony the following colloquy occurred:

"Q Rather than putting questions to you one at a time, let me ask you very broadly, at this time, if you are asked questions other than those relating to the books and records of Jola Corporation, will you assert your privilege against self-incrimination— A I would invoke—

"Q Let me finish my question.—and refuse to answer questions? A I invoke the provision of the Fifth Amendment to the United States Constitution and respectfully refuse to answer the questions.

evidence which was presented to the grand jury.

No hearing is necessary on the facts before me because the freedom from taint is not established from a claimed lack of utilization of immunized material but rather from the existence of a legitimate independent source.

"Q And so the record is clear, you are reading your information from a piece of paper and I assume that is from the advice of counsel; is that correct? A That is correct."

Counsel argues that it was prejudicial to call Goldman before the grand jury and ask him questions which the government attorney knew would elicit a claim of Fifth Amendment privilege. The government responds that there was no breach of agreement with counsel and that, regardless, the law of this circuit does not prohibit government counsel from summoning a target or potential defendant before a grand jury even if a privilege will be claimed. *Cf. United States v. Benjamin,.* 120 F.2d 521 (2d Cir. 1941).

Unless the target is called solely for the purpose of displaying his claim of privilege against self-incrimination to the grand jury, it is not improper to call him even if a privilege will likely be claimed. *See United States v. Fortunato,* 402 F.2d 79, 82 (2d Cir. 1968), *cert. denied,* 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969). The prosecutor's question assumed that Goldman would claim his privilege and, therefore, should not have been asked. Perhaps the prosecutor felt it necessary to explain to the grand jury why the target of the investigation was not being questioned concerning the transactions and events under investigation. But balancing the possibility of prejudice to the government against that to the target in lawfully claiming his privilege, it would have been better for the prosecutor to have avoided those areas where he had actual knowledge that the privilege would be claimed.

However, absolutely no prejudice resulted to this defendant because the grand jury before which he testified, the February 1975 Regular Grand Jury, was not the same grand jury which indicted Goldman, the January 1975 Additional Grand Jury. Wisely, the prosecution did not offer a transcript of Goldman's prior testimony to the grand jury which voted to indict.

On the whole, I am persuaded that the government attorneys have lived up to the high ethical standards required of them. *See Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); *United States v. Somers,* 496 F.2d 723, 726 (3d Cir. 1974), *cert. denied,* 419 U.S. 832, 95 S.Ct. 56, 42 L.Ed.2d 58 (1974).

## II. DISCOVERY AND INSPECTION

Government counsel and counsel for the defendant Irving Goldman have informally resolved much of the pretrial discovery. I must now resolve the disputed issues.

The defendant seeks copies of all invoices, bills and checks referred to in the indictment (Item 3). The government now indicates that it consents to this demand and the request is, therefore, granted.

██ Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), all exculpatory material is demanded (Item 7). Although the government acknowledges its *Brady* responsibilities, it opposes the present production of such material because it may provide the defendant with "an opportunity to fabricate a defense . . . ." There is, indeed, support for the proposition that *Brady* material need not be turned over prior to trial, *see United States ex rel. Lucas v. Regan,* 503 F.2d 1, 3 n. 1 (2d Cir. 1974), *cert. denied,* 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975). But if exculpatory evidence is produced for the first time at trial, the defendant may not have an adequate opportunity to effectively utilize the material, particularly if it points to the existence of other evidence helpful to the defendant. *See Grant v. Alldredge,* 498 F.2d 376, 382 (2d Cir. 1974) *citing United States v. Cobb,* 271 F.Supp. 159 (S.D.N.Y. 1967). I, therefore, direct that all *Brady* material be immediately provided to the defendant. *See United States v. Mitchell,* 372 F.Supp. 1239, 1257 (S.D.N.Y.1973).

██ All grand jury attendance and voting records, as well as any evidence considered by the grand jury (Item 8), a list of all witnesses who appeared before the grand jury (Item 16), and the grand jury testimony of Jack Zander (Item 14) and Kenneth Futernick (Item 15) are sought.

This material, it is argued, is necessary to determine if there was a proper quorum and voting and also to determine if the indictment is sufficiently supported by evidence. There is a presumption that the grand jury was properly convened and that it proceeded properly in returning an indictment. *See Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956); *Carroll v. United States*, 16 F.2d 951 (2d Cir.), *cert. denied*, 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880 (1927). The mere allegation that the grand jury did not act properly is insufficient to prompt further inquiry. *See Kastel v. United States*, 23 F.2d 156 (2d Cir. 1927) (L. Hand, J.), *cert. denied*, 277 U.S. 604, 48 S.Ct. 600, 72 L.Ed. 1010 (1928). Moreover, the arguments posed by defendant would have general application to all criminal cases. Of course, Items 14 and 15 may subsequently be available to the defendant pursuant to 18 U.S.C. § 3500.

■ Item 9 seeks to discover whether more than one grand jury received evidence concerning Goldman and the subject matter of the indictment and, if so, how many grand juries. The government has responded that more than one grand jury did receive such evidence and that the grand jury which indicted Goldman is different from the one before whom he testified. The disclosure of the number of grand juries which have investigated the activities of Mr. Goldman would not be relevant to a motion to dismiss or trial preparation. The request is denied.

■ The defense requests the identity of all individuals granted immunity from prosecution, together with documentation concerning the scope of that immunity (Item 10). To insure proper cross-examination, this material must be turned over to the defendant at trial in the event that any immunized witness testifies. *See United States v. Mitchell*, 372 F.Supp. 1239, 1257 (S.D.N.Y.1973). But balancing the defendant's *present* need for this information against the legitimate interest of the prosecution in avoiding premature disclosure of internal memoranda, I conclude that there will be no unfair prejudice to the defendant

in waiting until trial for this material which is primarily of impeachment value. *United States v. Pfingst*, 490 F.2d 262, 275, n. 14 (2d Cir. 1973).

■ Item 11 requests the precise details of communications between the United States Attorney and any official of New York State or New York City with respect to the defendant. The government has produced Justice Murtagh's order authorizing the transfer of grand jury material but opposes any disclosure beyond that. To the extent that such communications are embodied in "reports, memoranda, or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case," they are not discoverable. Rule 16(a)(2), Fed.R.Crim.P. Furthermore, the disposition of the motion to dismiss and the absence of facts which would prompt further inquiry, lead me to deny this request. Of course, if the material be of a *Brady* nature, then it must be produced.

■ Relying upon *United States v. Cannone*, 528 F.2d 296 (2d Cir. 1975), the defendant seeks the identity of all witnesses the government intends to produce at trial. *Cannone* indicates that the district court may, in the exercise of discretion, order such disclosure; the standard is whether "a specific showing of need for disclosure by the defendant" outweighs "a specific showing of need for concealment by the government." 528 F.2d at 302. The government argues a need for concealment based upon an October 6, 1975 indictment against Goldman charging him, *inter alia*, with conspiracy to commit perjury before a grand jury and bribery of a grand jury witness; the indictment was dismissed on grounds relating to the authority of the Special Prosecutor. The defense argues that it is improper to consider the allegation of any indictment much less one that has been dismissed. The government responds that *Cannone* expressly sanctions consideration of the allegations of an indictment. 528 F.2d 302 n. 6. Apart from the question of need for concealment, the witness list

will not be ordered produced because there is no demonstration of particular need by the defendant. Defendant seeks to justify disclosure in the following manner: "Given the complexity of the charges in the indictment herein, it would be consistent with the holding in *Cannone* for this Court to conclude that the government's flimsy arguments for concealment must yield to the defendant's need to adequately prepare and effectively conduct the trial." But considering the clarity and specificity of the indictment, the extensive discovery to date, and the great length of time that defense counsel has had to prepare for trial, there is no need for the witness list to be produced. A witness list is fundamentally different from *Brady* material which I have ordered to be produced immediately. Although exculpatory material might be used to fabricate a defense, it may also be employed to construct a legitimate defense. Ordinarily, *Brady* material consists of documents or statements already *in esse* and therefore not subject to the danger of alteration. A witness, on the other hand, might be subject to bribery, intimidation, or other foul play; the integrity of the witness' testimony cannot be guaranteed. On balance, the request for a witness list is denied.

■ Item 18(a) seeks "copies of all books, papers, documents or objects which the government intends to produce at trial." Under Rule 16(a)(1)(C), Fed.R.Crim.P., this material is unequivocally producible and it is, therefore, ordered produced.

■ Item 20 requests the date and substance of any and all communications between representatives of the United States Attorney or IRS and any employee of Jola Candy Co. or Gothic Color Co. Item 21 seeks similar communications with "any and all attorneys for any other individual or business entities with respect to defendant." These items are sought in connection with Goldman's motion to dismiss for prosecutorial misconduct. Defense counsel asserts that Item 20 might uncover an instance of a government agent improperly initiating contact with a person represented by counsel and Item 21 might disclose that

an attorney for a cooperating individual, if any, may have consulted with defendant's attorney about the investigation and then conveyed this information to the prosecution. A governmental invasion of a defendant's attorney-client privilege, if proven, would indeed be serious. *See United States v. Tramunti*, 425 F.Supp. 342 (S.D.N.Y. 1976), *aff'd* 543 F.2d 457 (2d Cir. 1976). But unless and until some factual showing is made by the defendant, it will be sufficient for the government to state whether any cooperating individual or his attorney obtained information about Goldman's defense from Goldman's attorney and then conveyed it to the government.

■ Items 23 and 24 seeks copies of all documents pertaining to defendant and his family and all documents with respect to defendant's alleged officership at Interborough and Jola. The government is directed to produce any such documents which it intends to offer at trial.

■ Item 25 is a request to procure copies of documents from any federal agency authorizing the investigation of the defendant. Rule 16(a)(2) insulates such internal government memoranda from production.

### III. BILL OF PARTICULARS

■ Defendant moves under Rule 7(f), Fed.R.Crim.P., for a bill of particulars. The government has consented to and has filed a bill of particulars and supplemental bill of particulars. Nevertheless, over 100 requested particulars remain in dispute; all but 4 relate to count 1 of the indictment.

The function of a bill of particulars is to insure that the defendant is adequately apprised of the charges, to avoid unfair surprise, and to permit him to raise the defense of double jeopardy if he is subsequently charged with the same offense. *Wong Tai v. United States*, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545 (1927). Whether a bill must be filed and the scope thereof is within the discretion of the court. *United States v. Cohen*, 518 F.2d 727 (2d Cir. 1975), *cert. denied, Duboff v. United States*, 423

U.S. 926, 96 S.Ct. 270, 46 L.Ed.2d 252 (1975). The nature of the charge, and the details provided in the indictment are important factors in determining whether additional details must be disclosed.

Goldman seeks information such as the "precise" manner in which he "did cause" an act alleged in the indictment to be performed; the "means" used to achieve an object apart from the means outlined in the indictment; and the place and date of preparation and mailing of an item. But since the government may prove a conspiracy by circumstantial evidence, disclosure of this type would unduly limit the government's proof at trial. *See United States v. Politi*, 334 F.Supp. 1318, 1321 (S.D.N.Y.1971) (Gurfein, J.).

The indictment, supplemented by the extensive particulars already furnished, more than adequately apprises Goldman of the essential facts. Disclosure of the type requested would be unprecedented and would amount to a point by point revelation of each morsel of the government's proof.

The motion for a Bill of Particulars is denied except as follows: the prosecution is directed to inform the defendant whether it is claimed that he was "an owner or operator of a private business" within the allegations of paragraph 9 of the indictment and, if so, of which private business. The government is directed to furnish all particulars which it has consented to in its brief.

The defendant's motion to dismiss the indictment is denied. The motions for discovery and inspection are denied except as indicated above.

The case is set down for trial on August 23, 1977.

IT IS SO ORDERED.