UNITED STATES of America, Plaintiff,

v.

Jack RICHTER, Slobodan Pavlovic,
Hristo Mangovski and Nikola
Konstantinov, Defendant.

No. 84 CR 235.

United States District Court,
N.D. Illinois, E.D.

April 5, 1985.

Roger Markley, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Nan Nolan, Patrick A. Tuite, Ltd., Michael Monico, Michael Goode, Chicago, Ill., for defendants.

## MEMORANDUM OPINION
## AND ORDER

ASPEN, District Judge:

In a sixteen count indictment[1] the government charges the four defendants with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and with violating reporting provisions of the so-called "Bank Secrecy Act," codified at 31 U.S.C. §§ 5311 *et seq.* and implemented by 31 C.F.R. § 103.11 *et seq.* (1984). The gist of the indictment is that the defendants "laundered" money by using a scheme to send large sums to Switzerland without alerting the watchful eye of the Internal Revenue Service ("IRS"). The defendants have filed a flurry of pretrial motions, the most significant being motions to dismiss the indictment under several theories. For the reason stated below, those motions are granted in part and denied in part: only Counts XI through XVI of the indictment are dismissed.

### Facts

We have gleaned the following facts from the indictment, which we assume to be true for the purposes of the motions before us. In late 1982, defendant Nikola Konstantinov ("Konstantinov") met several times with federal agents, whom he believed to be drug dealers. They allegedly discussed laundering of drug money. On March 10, 1983, Konstantinov introduced Agents Perez and Perry to defendant Slobodan Pavlovic ("Pavlovic"), and the four talked about money-laundering. Pavlovic

and Perry met several more times that spring. On June 6, 1983, Pavlovic introduced Perry and Agent Ahern to defendant Jack Richter ("Richter"), a lawyer in private practice. Pavlovic had been in the real estate business and, according to the defendants, was one of Richter's clients. On June 10, 1983, the agents gave Richter and Pavlovic $25,000 in cash to launder. That day the two defendants deposited amounts of about $9,600, $7,500 and $7,800 to Richter's client escrow account, keeping the rest as a fee. Three days later, they wired $23,000 to a Swiss bank account.

Similar transactions occurred throughout that summer. For example, on June 21, 1983, Richter and Pavlovic opened accounts at several Chicago banks, and they deposited another $85,000 of the agents' money in those accounts, with $9,900 going to eight of the accounts and $5,800 going to a ninth. On August 24, 1983, they received $115,000 and deposited the money in twelve accounts in $9,500 increments. All of this money was eventually wired to Switzerland, with Pavlovic and Richter deducting about 6% for fees.

Richter and Pavlovic broke up the large sums into units of less than $10,000 in order to prevent the federal government from learning about them. Under the Bank Secrecy Act and its implementing regulations, a "financial institution" must file a report with the IRS when it engages in a "transaction in currency" of more than $10,000. *See* 31 U.S.C. § 5313; 31 C.F.R. §§ 103.11, 103.22 (1984).[2] Richter and Pav-

---

**1.** The indictment originally named defendant Konstantinov in a seventeenth count, but we previously severed that count as improperly joined under Fed.R.Crim.P. 8(b).

**2.** 31 U.S.C. § 5313(a) provides:

(a) When a domestic financial institution is involved in a transaction for the payment, receipt, or transfer of United States coins or currency (or other monetary instruments the Secretary of the Treasury prescribes), in an amount, denomination, or amount and denomination, or under circumstances the Secretary prescribes by regulation, the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way

the Secretary prescribes. A participant acting for another person shall make the report as the agent or bailee of the person and identify the person from whom the transaction is being made.

31 C.F.R. § 103.22(a) imposes this duty to file a report on the financial institution which engages in a transaction of currency of more than $10,000:

(a) Each financial institution shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution, which involves a transaction in currency of more than $10,000. Such reports shall be made on forms prescribed by the Secretary

lovic allegedly knew that single deposits of more than $10,000 would have required the bank to file a "Currency Transaction Report" ("CTR") on "Form 4789" with the IRS. Through the above scheme they intended to and managed to deposit and transfer some $225,000 to Switzerland without alerting the government.

On October 4, 1983, Richter and Pavlovic met with Agent Reger to discuss a new laundering scheme, which would involve the use of a diplomat from Yugoslavia to "match" deposits in U.S. banks with deposits in Yugoslavia. On November 28, 1983, Agent Ahern gave them $15,000 to launder, and they showed him a copy of a plane ticket in defendant Hristo Mangovski's ("Mangovski") name to indicate that he was in Yugoslavia working out the mechanics of the new scheme. On January 24, 1984, the three defendants caused $12,750 to be wired from the "Stopanska Banka Skopje" in Yugoslavia to Switzerland.

The three defendants again changed their operation. On February 2, 1984, the agents gave $35,000 to Richter and Pavlovic, who in turn gave it to Mangovski. He deposited the money in several increments of less than $10,000 in the account of "Stopanska Banka-Skopje" at the Gainer National Bank in Merrillville, Indiana. On February 21, 1984, a matching amount, less a fee, was wired from the Yugoslavia Banka to Switzerland. On March 1, 1984, a similar scheme was carried out with another $75,000, and on March 20, 1984, the agents gave another $1,000,000 to Richter and Pavlovic. They in turn gave the money to Mangovski, deducted another fee and were apparently arrested sometime before consummating this last act of alleged misconduct.

Count One of the indictment charges that all four defendants conspired to defraud the United States in violation of 18 U.S.C. § 371. Konstantinov is not named as a defendant or mentioned in the remaining fifteen counts. Counts Two, Four and Six rest on the theory that Richter and Pavlovic were *de facto* financial institutions and charge them with three acts of failing to file CTRs, in violation of 31 U.S.C. §§ 5313 and 5322(b). Counts Three, Five and Seven charge those two with causing banks to fail to file CTRs, in violation of 31 U.S.C. §§ 5313, 5322(b) combined with 18 U.S.C. § 2(b). Counts Eight, Nine and Ten charge Richter, Pavlovic and Mangovski with failing to file CTRs concerning the "Yugoslavian" transaction, in violation of 31 U.S.C. §§ 5313, 5322(b) and 18 U.S.C. § 2. The remaining counts charge Richter and Pavlovic with various acts of wire fraud in violation of 18 U.S.C. § 1343.

The defendants have made various statutory and constitutional challenges to the indictment. They argue principally that:

(1) The indictment does not allege cognizable conspiracy offenses or violations of the Bank Secrecy Act.

(2) The alleged violations of the Act are legally impossible because all of the money belonged to the government.

(3) The indictment does not state cognizable wire fraud offenses.

(4) The indictment is impermissibly vague.

(5) The Act as applied violates the Search and Seizure Clause of the Fourth Amendment and the Self-Incrimination Clause of the Fifth Amendment.

(6) The government's undercover operation was outrageous in violation of the Due Process Clause, warranting dismissal of the indictment.

and all information called for in the forms shall be furnished.

The terms "transaction in currency" and "financial institution" are defined at 31 C.F.R. § 103.-11. The former means:

> *Transaction in currency.* A transaction involving the physical transfer of currency from one person to another. A transaction which

is a transfer of funds by means of bank check, bank draft, wire transfer, or other written order, and which does not include the physical transfer of currency is not a transaction in currency within the meaning of this part.

The latter is defined below at p. 13, so we will not set it forth here again.

We now turn to these, and a few ancillary, challenges.

### The Motion to Dismiss the Conspiracy Count

Count One of the indictment alleges that all four defendants conspired to defraud the United States, in violation of 18 U.S.C. § 371. That section states in relevant part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

This section has two prongs. It reaches both conspiracies to commit substantive federal offenses and those to commit frauds against the United States which are not made criminal by other legislation. Paragraph 2 of Count One tracks both prongs. First, it charges the defendants with conspiring to defraud the United States by structuring their currency transactions to impair the lawful functions of the Department of the Treasury in collecting data about transactions greater than $10,000. *See* 31 U.S.C. §§ 5311 *et seq.;* 31 C.F.R. § 103.11 *et seq.* Second, it accuses the defendants of conspiring to conceal and cover-up, by scheme and device, material facts in a matter within the jurisdiction of the Treasury Department, in violation of 18 U.S.C. § 1001.[3] In sum, Count One does not allege any violations of other substantive criminal offenses. It simply charges a conspiracy to defraud the United States and to violate 18 U.S.C. § 1001. We will first consider the alleged conspiracy to defraud.

"Fraud" as meant in § 371 is broader than its common law namesake. *Dennis v. United States,* 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966); *United States v. Turkish,* 623 F.2d 769, 771 (2d Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981). It embraces "any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government." *Dennis,* 384 U.S. at 861, 86 S.Ct. at 1844 (quotations and citations omitted). It is well established that the term "defraud" as used in § 371 not only reaches schemes which deprive the government of money or property, but also is designed to protect the integrity of the United States and its agencies, programs and policies. *United States v. Johnson,* 383 U.S. 169, 172, 86 S.Ct. 749, 751, 15 L.Ed.2d 681 (1966); *United States v. Burgin,* 621 F.2d 1352, 1356 (5th Cir.1980), *cert. denied,* 449 U.S. 1015, 101 S.Ct. 574, 66 L.Ed.2d 474 (1980). The government charges that the defendants conspired to trick the banks into not filing CTRs with the IRS by breaking up their huge deposits into chunks of less than $10,000.

The defendants emphasize that the Bank Secrecy Act and its regulations imposed no duty on them to file CTRs as individuals.[4] Nor does any law specifically forbid them from making deposits in sums less than $10,000. Nor did they employ deceitful means, in the sense of using fictitious names or forging signatures. Rather, everything they did was in the "open." They agreed to make, and then made, deposits in their own names, with the hitch that they either made those deposits at several different banks or in increments at one bank. While, as we discuss later, the arguments are arguably relevant to wheth-

---

**3.** 18 U.S.C. § 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**4.** Although the Secretary of Treasury has the power under 31 U.S.C. § 5313 to require that individuals file CTRs, the Secretary has imposed that duty only on financial institutions. *See* 31 C.F.R. § 103.22(a); *United States v. Tobon-Builes,* 706 F.2d 1092, 1097 (11th Cir.1983).

er the underlying substantive offenses were committed, they do not bear on whether an unlawful conspiracy was committed. The crime alleged in Count One is not the making of deposits of less than $10,000, but conspiring to use tricks to deprive the IRS of CTRs. To be held liable under the fraud prong of § 371, the defendants need not have agreed to commit, or actually committed, a substantive offense. They merely must have agreed "to interfere with or obstruct one of [the government's] lawful...functions by deceit, craft or trickery, or at least by means that are dishonest."[5] *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). We think it plain that defendants' conspiracy contemplated "interfering with" or "obstructing" the government function of receiving CTRs. We also think that defendants' alleged means, while "open" in a limited sense, were "dishonest" in an overall sense. They clearly intended to disguise their transactions as something other than what they in fact were—deposits of greater than $10,000—so that the government would not take notice of the movement of this money. *See United States v. Hajecate,* 683 F.2d 894, 896–97 (5th Cir.1982) (acts which are themselves legal lose their legal character when they become elements of an unlawful scheme), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 298 (1983).

Several other courts have held that similar agreements to "launder" money were indictable under § 371. *See United States v. Puerto,* 730 F.2d 627, 630–31 (11th Cir. 1984), *cert. denied,* —— U.S. —— 105 S.Ct. 162, 83 L.Ed.2d 98 (1984); *United States v.*

*Percival,* No. 82–20026 (C.D.Ill. February 7, 1983) (Ackerman, J.).[6] As the Court in *Puerto* held:

> The government (IRS) has an interest in receiving accurate reports from financial institutions indicating when customers engage in transactions in excess of $10,-000. It seeks this information in furtherance of its criminal, tax, and regulatory investigations and proceedings. In order for this lawful governmental function to proceed, it is vital that accurate reports be sent by financial institutions to the IRS. The Puertos and Everett interfered with and obstructed this lawful function of the IRS by conspiring to submit false CTRs to the financial institution. Thus, they interfered with and obstructed the lawful functions of the government in the collection of data and reports of currency transactions in excess of $10,000 for use in criminal, tax, and regulatory investigations and proceedings. The Puertos and Everett defrauded the United States Government, in violation of 18 U.S.C.A. § 371, by conspiring to have the financial institution transmit false CTRs to the IRS.

730 F.2d at 631. It is true that the defendants in *Puerto* filed false documents, while the defendants here did not do so, but that is not important to the conspiracy count, as we described above.

■ Count I also tracks the second prong of § 371, charging that the defendants conspired to commit an offense against the United States, that is, to conceal by trick material facts within the jurisdiction of the Treasury Department in vio-

---

**5.** Of course, the defendants must have also allegedly committed at least one overt act in furtherance of the conspiracy. Many overt acts are alleged here, and defendants do not challenge that element of the offense charged.

**6.** Although we agree with much of Judge Ackerman's analysis in upholding the § 371 charges in *Percival,* we do disagree with part of his reasoning. He stated that he would have dismissed the indictment had defendants there evaded the CTR process because of "innocent" motives. Slip op. at 10–11. We think that this *dictum* is inconsistent with the fundamental ten-

et of criminal law that motive is not an element of an offense, but is relevant only to intent, which is obviously an element of any offense. Regardless of *why* someone wants to evade the reporting requirements of the Bank Secrecy Act, an offense is committed if he *intends* to evade the Act and does in fact violate the Act. In this case, as in *Percival,* then, the offense is agreeing to and intending to evade the Act, and then taking steps to do so. The "whys" and "wherefores" of the agreement might tend to prove intent, but are not elements of the offense charged.

lation of 18 U.S.C. § 1001. The indictment does not charge the defendant with an actual violation of § 1001; it merely charges them with conspiring to do so. Like § 371, § 1001 encompasses two distinct offenses, false representation and concealment of a material fact. *United States v. Tobon-Builes,* 706 F.2d 1092, 1096 (11th Cir.1983), *rehg. denied,* 716 F.2d 914 (1983); *United States v. Diogo,* 320 F.2d 898, 902 (2d Cir. 1963). This case involves only the second part of § 1001—concealment—since no actual false statements or representations are alleged. A concealment charge requires that the defendant have been under some statutory or regulatory duty to disclose the material information. *Tobon-Builes,* 706 F.2d at 1096–97. It is "incumbent on the government to prove that the Defendant had the duty to disclose the material facts at the time he was alleged to have concealed them." *United States v. Irwin,* 654 F.2d 671, 678 (10th Cir.1981), *cert. denied,* 455 U.S. 1016, 102 S.Ct. 1709, 72 L.Ed.2d 133 (1982). Transposed to the conspiracy context, the government here must prove that the defendants agreed to conceal material facts which they had a duty to disclose, and that they took one or more overt steps to further their agreement.

■ We think the indictment sufficiently alleges such a conspiracy. That an agreement and overt acts are alleged is not disputed. What is disputed is whether the defendants had a duty to disclose material facts. It is true, as we noted above, that the defendants had no duty to file a CTR with the government. But the defendants *did* have an affirmative duty not to cause the bank to fail to file a CTR.[7] By agreeing to break their deposits into chunks, the defendants agreed to "conceal or cover up

---

**7.** This duty is spelled out in greater detail below, at 9–13, in the section dealing with the alleged substantive violations of the Bank Secrecy Act.

**8.** In so holding, we disagree with Judge Ackerman's holding in *Percival, supra,* slip op. at 12–14, that there was no conspiracy to violate § 1001.

by ... trick, scheme, or device" the material fact that they were depositing sums totalling more than $10,000. As noted above, those acts, considered in isolation, were lawful, but they lost their lawful character when considered as part of a scheme to intentionally deprive the government of material information it would otherwise receive. *Tobon-Builes, supra,* supports this holding. While the defendants used false statements in that case, the court upheld their convictions under § 1001 on the basis of that statute's concealment clause. 706 F.2d at 1096–97. As we do, the court held that the material facts concealed "were the existence, origin, and transfer of [more than $10,000] in cash." *Id.* at 1096. The duty not to conceal those facts was imposed by the Bank Secrecy Act and its regulations. The Court rejected the same arguments that the defendants make here about duty to disclose. *Id.* We follow this holding.[8]

In sum, then, we deny the defendants' motion to dismiss insofar as it challenges Count One of the indictment.

### Counts Three, Five and Seven: Substantive Violations of the Bank Secrecy Act

■ Counts III, V and VII name only Richter and Pavlovic as defendants, charging that on June 10, 1983, June 21, 1983, and August 24, 1983, they caused the American National Bank and Trust Company ("American") to fail to file CTRs.[9] The government concedes that if viewed as individual depositors the defendants had no duty to file CTRs themselves, but argues that by virtue of 18 U.S.C. § 2, the defendants violated 31 U.S.C. §§ 5313 and 5322(b) by causing the bank not to file CTRs. 18 U.S.C. § 2(b) provides:

---

**9.** For example, on June 10, 1983, defendants allegedly deposited a total of about $25,000 at American in three smaller chunks. On June 21, 1983, they did the same thing at American with about $20,000. And on August 24, 1983, they did so with about $19,000. On some of these dates they allegedly made deposits of less than $10,000 at other banks, but these acts are not alleged as separate substantive violations.

Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

This section does not create any substantive offenses itself, *see United States v. Cook,* 745 F.2d 1311, 1315 (10th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1205, 84 L.Ed.2d 347 (1985), but it imposes liability on one who causes a third party to commit a substantive offense. *See United States v. Tobon-Builes,* 706 F.2d 1092, 1099 (11th Cir.1983) (and cases cited therein). A defendant can be convicted under § 2(b) even if the third party acted without criminal intent and therefore could not be convicted of the substantive offense charged. *Id.* Relying on these principles, the government argues that the defendants are liable for causing the bank to not file a CTR by acts, "which if directly performed by [it] ... would be an offense against the United States," that is, a violation of 31 U.S.C. § 5313 and 31 C.F.R. § 103.22(a). The government relies on several similar cases which combined § 2 and § 5313 to uphold convictions. *See Cook,* 745 F.2d at 1315; *United States v. Puerto,* 730 F.2d 627, 632–34 (11th Cir.1984); *Tobon-Builes,* 706 F.2d at 1099; *see also United States v. Thompson,* 603 F.2d 1200 (5th Cir.1979) (same theory but no express reliance on § 2(b)); *United States v. Konefal,* 566 F.Supp. 698, 701–02 (N.D.N.Y.1983) (same). The defendants argue that we should distinguish or simply decline to follow these decisions. We believe that these decisions are correct, so we will deal with defendants' attempts to distinguish these cases.

Defendants rely heavily on the fact that in several of these cases, the defendants used false names and/or purchased cashier's checks in such a way as to cause the bank either to file false CTRs or to not file

a CTR at all.[10] They read these cases as holding only that "by using a false name and through the purchase of cashier's checks, the depositor affirmatively prevented the bank from obtaining any information and thus 'caused' the bank not to file the CTR." Defendants' Reply Memorandum at 7. They emphasize that in this case they simply and "openly" broke up their large cash deposits, without using forgery, aliases or other relatively overt deceptive acts. They conclude that in being so open they did not "cause" the banks to file a CTR, and that the above cases are thus inapposite.

■ Defendants read these cases too narrowly. Insofar as the above cases combined § 2 and § 5313,[11] they did not rely on the use of false statements as the basis for upholding convictions. The crimes upheld there were somehow causing a bank not to file a CTR, with the specific intent of evading the Bank Secrecy Act and its regulations. For example, the court in *Tobon-Builes,* relying on *United States v. Thompson,* 603 F.2d at 1203–04, rests on the theory that the basic wrong is intentionally structuring large transactions as multiple smaller transactions to avoid the reporting requirements of the Act. 706 F.2d at 1098. Similarly, *United States v. Cook* read the above cases as supporting a conviction "where proof exists that the individual knowingly and willfully caused a financial institution to fail to file an accurate CTR." 745 F.2d 1311. The crime likewise exists where the individual causes the bank's failure to file *any* CTR. *United States v. Puerto,* 730 F.2d at 632–33. The gravamen of these cases is that the crime rests on specific intent to evade the reporting requirements and acts which in fact cause the evasion of the requirement. The present indictment alleges these elements.

---

**10.** *See, e.g., Tobon-Builes,* 706 F.2d at 1095 (use of false names was part of scheme of purchasing many cashier's checks of less than $10,000 in one day); *United States v. Cook,* 745 F.2d at 1313 (false names and addresses).

**11.** Some of these cases also relied on the false statements to uphold convictions under 18

U.S.C. § 1001 or other federal "false statement" statutes. *See Cook,* 745 F.2d at 1312 (defendant indicted under 31 U.S.C. § 5313 and 42 U.S.C. § 408(g)(2), concerning use of false social security number); *Puerto,* 730 F.2d at 632–33 (falsifying and concealment violations of § 1001).

The use of false statements in these cases was relevant only as the *means* by which defendants fulfilled their scheme. These cases do not foreclose prosecution of defendants who use other means to avoid the Act, even defendants who tell no overt lies.[12] Defendants' false statements distinction is a red herring.

The defendants miss the point when they argue that nothing they allegedly did affirmatively prevented the filing of CTRs. "No subterfuge was used to conceal the identity or amounts of deposits." Reply Memorandum at 8. However "open" the defendants' transactions were, by splitting their deposits they did allegedly manage to prevent the bank and, more importantly, the IRS, from learning that they were dealing in sums larger than $10,000. This *was* an affirmative subterfuge,[13] and *did* allegedly cause the bank not to file a CTR. This is all the statutes, as construed by the above cases, require.

The defendants next assume for argument's sake that the above theory is correct and argue alternatively that the Act and regulations do not prohibit multiple

deposits totalling over $10,000. Their argument is somewhat complex and deserves some elaboration. But once elaborated and understood, it can be rejected as meritless.

They first point out that the Act and regulations do not expressly address the multiple deposit situation. They next establish that the bank itself is under no clear duty to file a CTR in the multiple deposit situation.[14] Given that the bank has no clear duty to file a CTR when a depositor comes in twice a day with money totalling more than $10,000, the defendants conclude that they cannot be charged with "causing" the bank not to fulfill a duty which it does not have.

This argument contains one fatal flaw. It silently mischaracterizes[15] the alleged offense. The alleged offense is intentionally causing the bank to not file a CTR. What *caused* the failure was the act of breaking up the large sums into smaller ones. Under § 2, it is *these* acts, "if directly performed by"[16] bank officials which would violate § 5313. Defendants' argument silently assumes that the alleged crime is something else: failure to file a CTR when

---

12. *United States v. Gimbel,* No. 84 CR 10 (E.D. Wis. March 12, 1985) (Decision and Order on Government's Motion to Reconsider), relied upon by defendants, supports our reading of *Tobon-Builes* and its progeny: "Had [Tobon-Builes] not used fictitious names and merely broken up his transactions to avoid detection, he still could have been (and was) charged with concealment." Slip op. at 14.

13. It is true that defendants did not hide their identities or conceal the amount of each deposit. But their otherwise legitimate acts lost their legal character because they were part of the subterfuge to evade the Act. *See Tobon-Builes,* 706 F.2d at 1098 (unlawful scheme strips otherwise legal acts of their legal character) (citation omitted).

14. Several authorities have stated that the bank has no affirmative duty to file a CTR when a depositor comes in twice or more during a day with deposits totalling more than $10,000. *See United States v. Gimbel,* No. 84 CR 10, slip op. at 26–27 (E.D.Wis. Aug. 23, 1984); *United States v. San Juan,* 405 F.Supp. 686, 692–93 (D.Vt.1975) (discussing analogous foreign reporting provisions of Act), *rev'd,* 545 F.2d 314 (2d Cir.1976); Wisotsky, *Exposing the War on Cocaine: The Futility and Destructiveness of Prohibition,* 1983

Wis.L.Rev. 1305, 1370. The IRS amended Form 4789 (the CTR form) in 1980 to impose such a duty on banks, but this amendment was never promulgated pursuant to the notice and comment procedures of the Administrative Procedure Act. *See* 5 U.S.C. § 553. Thus, a strong argument exists that the banks have no duty to file a CTR in the multiple deposit situation. *Cf. United States v. $200,000 in U.S. Currency,* 590 F.Supp. 866 (S.D.Fla.1984) (IRS form relevant to foreign reporting provisions was void for not being amended under notice and comment procedures of APA).

15. We by no means accuse defendants' able counsel of intentionally mischaracterizing the offense.

16. Section 2 punishes an individual as a principal if he or she intentionally causes "an act to be done which if directly performed by him *or another*" would be a federal offense (emphasis added). The "financial institution" and its employees are the "another" person under our application of § 2 in the text. Thus, if bank officials were to split up large sums into blocks of less than $10,000, they would surely violate the Act for failing to file a CTR.

a depositor comes in with multiple deposits of more than $10,000. *See* n. 14, *supra.* They focus on whether the bank officials had a duty to file a CTR had they known that defendants had come in with multiple deposits of more than $10,000. The defendants thus focus on a later part of time line. Even if the bank had no duty to file a CTR in the multiple deposit situation, *the crime had already been committed:* the defendants had intentionally structured their transactions to evade the reporting requirements of the Act. The crime was breaking up the deposits to cause the bank to fail to file a CTR where it would have done so had the deposits not been broken up. The relevant duty—the existence of which is not disputed—is the duty of the bank to file CTRs for single deposits of more than $10,000. The defendants allegedly caused the bank not to fulfill *this duty.* The other, later "duty"—whether the bank is required to report transactions *already* broken into increments—is irrelevant here. It does not matter whether the defendants caused the bank not to fulfill this possible duty.

■ Finally, as for defendants' related argument that the statutory scheme for imposing liability is void for vagueness, we follow the courts which have already rejected similar arguments. *See United States v. Cook,* 745 F.2d at 1315–16; *United States v. Anzalone,* No. 84–68–MA, slip op. at 19–20 (D.Mass. July 2, 1984).[17] We therefore reject defendants' attack on Counts III, V and VII of the indictment.

*The Impossibility Defense*

The defendants next argue that it was legally impossible for them to violate the criminal statutes in question.

■ As for the conspiracy count, Count I, the defense is of no avail. It is plain that the crime of conspiracy focuses on an *agreement* to defraud the United States or to violate the law and an overt act to further that agreement. Whether the actual crime could have been factually or legally consummated is not a defense. *See United States v. Rose,* 590 F.2d 232, 235 (7th Cir. 1978), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1978); *United States v. Meyers,* 529 F.2d 1033, 1037 (7th Cir. 1976), *cert. denied,* 429 U.S. 894, 97 S.Ct. 253, 50 L.Ed.2d 176 (1976); *United States v. Rosner,* 485 F.2d 1213, 1229 (2d Cir. 1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974).

■ As for Counts III, V and VII, defendants cannot use the impossibility defense. They argue that all the money deposited in this case was government money, and that government money is exempt from the reporting requirements. *See* 31 C.F.R. § 103.22(b)(2)(iii).[18] Absent a legal duty on the bank to report, no offense is legally possible, conclude the defendants. We do not agree that this regulatory exemption reaches the situation alleged in the indictment. The language of the regulation asks not whether the deposit was simply of "government money," but rather whether the deposit was *"by* local or state *governments,* or *the United States* or any of its *agencies."* (emphasis added). This

---

17. The defendants rely heavily on United States v. Gimbel, cited above in n. 13, in their vagueness argument as well as their arguments concerning cognizable violations of the Act. *Gimbel* is not exactly on point, since the crime alleged there was failure to disclose the real party in interest in defendants' *deposits. See* Decision and Order on Government's Motion to Reconsider (March 12, 1985) (defendant not accused of causing bank to fail to file CTR in his or firm's own name). While defendants here, like Gimbel, were acting on behalf of others, they are charged with causing the bank to fail to file CTRs in their *own* names. To the extent that *Gimbel* is broader than we have read it, we

decline to follow it, adopting the approach of *Tobon-Builes* and its progeny.

18. Section 103.22(b)(2)(iii) provides

Except as otherwise directed in writing by the Assistant Secretary (Enforcement and Operations), a bank may exempt from the reporting requirement of this section the following:

Deposits, or withdrawals, exchanges of currency or other payments and transfers by local or state governments, or the United States or any of its agencies or instrumentalities.

exemption embraces, we believe, transactions *by* government *agencies* in their normal course of governmental business. In this case, while the money "belonged" to the government, in the sense of "title," it was deposited *by* the defendants—private parties—who believed the money to also be private. This is not a normal deposit by the government as part of its day-to-day operations. If we were to read the exemption as broadly as do the defendants, we would cripple most, if not all, government undercover operations in this area. The regulation was obviously not written with this intent. Instead, it was presumably written to relieve the banks (and the IRS) of the heavy burden of filing forms for every routine governmental agency transaction of over $10,000. Government agencies deal every day in large sums, and the act and the regulations were not written for the IRS to monitor this enormous daily flow of government money. *See* 31 U.S.C. § 5311 (Act intended to be used for criminal, tax or regulatory investigation). Our reading of the regulation is consistent with this fundamental intent of the Act. Because we do not believe the exemption reaches the facts of this case, we need not decide whether it could have given defendants a viable defense had it applied.

### Constitutionality of the Bank Secrecy Act

Defendants contend that the application of the reporting provisions of the Bank Secrecy Act violates their Fifth Amendment privilege against self-incrimination, their Fourth Amendment rights against unreasonable searches and seizures and their attorney-client privilege. The Court rejects all of these arguments.

#### a. *Fifth Amendment*

The defendants argue that the reporting provision of § 5313 force the defendants to reveal information to the government "which has a strong potential of becoming self-incriminating." Defendants' Memorandum in Support of Motion to Dismiss at 30. *California Bankers Ass'n v. Shultz,*

416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974) holds otherwise.

In *California Bankers,* several banks and individual depositors filed a civil suit challenging the constitutionality of, among other things, the reporting provisions at issue in this case. The Court rejected as "premature" the claims of the depositor-plaintiffs that their Fifth Amendment rights were violated. 416 U.S. at 75, 94 S.Ct. at 1524. This holding rested in part on the conclusion that none of the depositors had alleged that they had been or would be involved in transactions of greater than $10,000. *Id.* More importantly, the holding rested equally on the conclusion that no allegation or evidence suggested that any information required to be disclosed would tend to incriminate any plaintiff-depositor:

> Not only is there no allegation that any depositor engaged in such transactions, but there is no allegation in the complaint that any report which such a bank was required to make would contain information incriminating any depositor. To what extent, if any, depositors may claim a privilege arising from the Fifth Amendment by reason of the obligation of the bank to report such a transaction may be left for resolution when the claim of privilege is properly asserted.

*Id.* This holding controls here. The defendants here do not assert that compelled disclosure of their deposits might have tended to incriminate *them.* And the record does not, to our knowledge, indicate that disclosure would have revealed potentially incriminating information about *these* defendants. Like the depositors in *California Bankers,* defendants argue that the disclosure requirements could reveal information with a "strong *potential*" of becoming self-incriminating. They are arguing in the abstract, claiming that other depositor's rights may be infringed. Because they do not show how the information revealed might have potentially incriminated *them,* their arguments must be rejected for not resting on a cognizable Fifth Amendment right. *See also United States*

*v. Dichne,* 612 F.2d 632 (2d Cir.1979) (analogous foreign reporting requirement does contain substantial risk of revealing incriminating information), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980).

Defendants' reliance on the trilogy of *Marchetti v. United States,* 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968); *Grosso v. United States,* 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906 (1968); *Haynes v. United States,* 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968), is misplaced. In each of these cases the Court struck down reporting provisions of other statutes because disclosure would have revealed information which was substantially likely to incriminate defendants under other criminal statutes. *See, e.g., Marchetti,* 390 U.S. at 47–48, 88 S.Ct. at 702 (tax statute requiring disclosure of gambling revenues would necessarily reveal information incriminating defendant under state and federal substantive gambling offenses). Thus, those cases, unlike this one, involved compelled disclosure of *incriminating* evidence.[19] For this reason, the *California Bankers* opinion distinguished that trilogy. 416 U.S. at 74, 94 S.Ct. at 1524. So do we.

### b. *Fourth Amendment*

The plaintiffs in *California Bankers* also argued that the Act violated their Fourth Amendment rights. The Court held that no Fourth Amendment rights of the *banks* were violated, 416 U.S. at 66, 94 S.Ct. at 1520, but that the individual depositors lacked standing to raise the Fourth Amendment issue. *Id.* at 68, 94 S.Ct. at 1520–21. The Court so held because none of the depositors had alleged that they had engaged in or would engage in transactions of greater than $10,000; the depositors lacked standing because no "search" had been conducted or was imminent.

The defendants here argue that the Act as applied violates the Fourth Amendment. However, as in the Fifth Amendment context, the defendants make no showing that *their* Fourth Amendment rights had been implicated. We therefore hold that they cannot properly raise the Fourth Amendment defense.

■ It is crucial that the defendants nowhere argue that a "search" or "seizure" of some kind has taken place. Obviously, they could not so argue. If we assume the truth of the facts in the indictment, we find that the defendants managed to deposit their money without triggering the Act's reporting requirements. Thus, no search or seizure actually happened in this case. The defendants successfully *avoided* a search and are being prosecuted for doing so. But the plain language of the Fourth Amendment protects citizens only from "unreasonable searches and seizures."

A "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. A "seizure" of property occurs when there is some meaningful interference with an individual's possessory interests in that property.

*United States v. Jacobsen,* 466 U.S. 109, ——, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). Here no expectation of privacy was, in fact, "infringed," and no "possessory interests" were "interfered with." Accordingly, no interests protected by the Fourth Amendment are involved in this case. *See Rakas v. Illinois,* 439 U.S. 128, 134–35, 99 S.Ct. 421, 426, 58 L.Ed.2d 387 (1978) (in order to qualify as a person aggrieved by a search, one must have been a victim of a search or seizure).

In so holding we are certainly not stating that defendants lack Article III standing to challenge the statute. Obviously, since they are being prosecuted under the Act, they have suffered an "injury in fact." But, while they have standing to challenge

---

**19.** A case which would properly raise the Fifth Amendment issue would presumably be where the government obtained potentially incriminating information from a CTR about a certain defendant. Thus, were a defendant charged with, say, a drug offense, and had the government relied on evidence revealed in a CTR, that defendant could properly invoke the Fifth Amendment defense. Whether the defense would succeed is something we need not now address.

the statute, they must show that its application violated one of their constitutional rights. Their injury is not one cognizable under the Fourth Amendment, and thus they cannot base their challenge on that Amendment.[20] Defendants lack what used to be called "standing" under Fourth Amendment doctrine. Although the *Rakas* court rejected the "standing" label as part of Fourth Amendment doctrine, *see* 439 U.S. at 139–40, 99 S.Ct. at 428–29, it retained the basic principle that a person invoking the Fourth Amendment must himself suffer an injury cognizable under that Amendment. *Id.* Because no search or seizure took place in this case, defendants have suffered no Fourth Amendment injury.

In any event, we do not think that the Fourth Amendment defense is valid even on the merits. Courts since *Shultz* have held that information recorded by banks under the Act, or submitted in a CTR, is not protectible under the Fourth Amendment in that the depositor has no legitimate expectation of privacy in the records or information. *United States v. Miller*, 425 U.S. 435, 440–443, 96 S.Ct. 1619, 1622–24, 48 L.Ed.2d 71 (1976) (bank records compiled under recording provisions of Act may be subpoenaed because depositor lacks expectation of privacy); *United States v. Kaatz*, 705 F.2d 1237, 1242 (10th Cir.1983) (no Fourth Amendment violation where bank submits CTR which later reveals evidence incriminating defendant of tax evasion). In sum, then, we reject the Fourth Amendment defense.

### c. *Attorney-Client Privilege*

■ The defendants next argue that the Bank Secrecy Act as applied violates both the attorney-client privilege and the Sixth Amendment. Their argument rests principally on this hypothetical:

> An attorney who receives over $10,000 from a client would be required to deposit it in such a manner that a CTR would be filed. Unless he structured the depos-

it to avoid the filing of the CTR, the attorney would be furnishing a "link in the claim [sic] of evidence" that could lead to the prosecution and conviction of his client. *See United States v. Kuh*, 541 F.2d 672, 676 (7th Cir.1976). The Government's construction of the Bank Secrecy Act compels attorneys to provide incriminating leads and evidence against their own clients.

Defendants' Motion to Dismiss Because Bank Secrecy Act as Applied Violates the Attorney-Client Privilege and Sixth Amendment, ¶ 4. The problem with this argument, like the Fifth Amendment defense, is that it is hypothetical. Defendants do not argue that *their* attorney-client privilege was pierced. Defendant Richter did not furnish incriminating evidence via a CTR; nor is there evidence that a CTR would have incriminated his client. The indictment does not address the situation of a lawyer in good faith trying to avoid revealing evidence within the privilege. Rather, it charges the defendants with simply unlawfully evading the Act. We fail to see how the privilege is implicated in this case.

### *Counts XI through XVI: Wire Fraud*

The six wire fraud counts charge that defendants Richter and Pavlovic schemed to evade the IRS's currency reporting statutes, and that, in furtherance of this scheme, they wired funds on several occasions from the United States to Switzerland. The defendants argue that the indictment does not allege a cognizable violation of 18 U.S.C. § 1343, the wire fraud statute. Both sides agree that this is a question of first impression.

■ The wire fraud statute reads in relevant part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by

**20.** As the *Rakas* court noted, one asserting a legal right must allege both an injury in fact *and* a claim that his own legal rights were violated, not those of third parties. 439 U.S. at 139–40, 99 S.Ct. at 428–29.

means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1343.[21] This statute contains two essential elements: (1) a scheme to defraud; and (2) using, or causing the use of, wire communications in furtherance of the scheme. *E.g., Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). The first element in turn encompasses two general categories of fraud schemes. One category includes schemes which intend the deprivation of tangible economic interests, i.e., money or property.[22] *See, e.g., United States v. Lindsey*, 736 F.2d 433, 436 (7th Cir.1984). The second category concerns schemes to deprive an individual or entity of intangible rights or interests, otherwise known as "fiduciary fraud" or "intangible rights fraud." *See United States v. Alexander*, 741 F.2d 962, 964 (7th Cir.1984); *United States v. Margiotta*, 688 F.2d 108, 121 (2d Cir.1982), *cert. denied*, 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Boffa*, 688 F.2d 919, 925–26 (3d Cir.1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); *United States v. Freedman*, 568 F.Supp. 450, 453 (N.D.Ill.1983); *United States v. Dorfman*, 532 F.Supp. 1118, 1123 (N.D.Ill.1981). The meaning of "fraudulent scheme" in the "tangible rights" category is certainly quite broad. *See Lindsey*, 736 F.2d at 436 (measure of fraud depends on departure from fundamental honesty, fair play and candid dealings). "Fiduciary fraud" can also encompass a wide range of schemes, but as its name suggests, it does have one significant limitation: so far as we have been able to determine liability under an intangible rights theory hinges on the existence of a fiduciary duty owed by at least one of the schemers to the person or entity defrauded. *Alexander*, 741 F.2d at 964; *Freedman*, 568 F.Supp. at 450; *Dorfman*, 522 F.Supp. at 1123. The fiduciary duty may exist between private parties, where the scheme, for example, is designed to deprive the victim of the loyal and honest service of an employee. *See Dorfman*, 532 F.Supp. at 1123 (and cases cited therein) (defendants who owe fiduciary duty to pension fund are indictable under § 1343 for depriving fund of intangible right of loyal service of employees). Or the fiduciary duty may exist between a public official and the citizenry, where the official is involved in, say, a bribery scheme or other misuse of power. *Freedman*, 568 F.Supp. at 453; *see also United States v. Bush*, 522 F.2d 641 (7th Cir.1975), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976). Liability may even extend to a private person who is a non-fiduciary, if he or she has schemed with public employees who did owe a fiduciary duty to a public entity. *See Alexander*, 741 F.2d at 964; *United States v. McManigal*, 708 F.2d 276 (7th Cir.1983), *vacated*, — U.S. —, 104 S.Ct. 419, 78 L.Ed.2d 355 (1983), *aff'd on remand*, 723 F.2d 580 (1983); *cf. United States v. George*, 477 F.2d 508 (7th Cir. 1973) (non-fiduciary of corporation guilty for scheming with employee who did owe fiduciary duty to the corporation), *cert. denied*, 414 U.S. 827, 94 S.Ct. 155, 38 L.Ed.2d 61 (1973). The common thread in these intangible rights cases is that the defendant or a co-schemer must have owed a fiduciary duty of some kind to the defrauded party. This contrasts with the tangible rights case, where a schemer can be held liable regardless of his or her relationship to the victim. *Alexander*, 741 F.2d at 964.

■ The defendants argue that they owed no fiduciary duty to the IRS, and thus they cannot be indicted under an in-

---

21. In discussing this statute below, we rely on cases which involved violations of the similar mail fraud statute, as well as those involving § 1343. *See United States v. Feldman*, 711 F.2d 758, 763 n. 1 (7th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983).

22. The government does not contend that it was defrauded of any tangible economic right in this case. It was allegedly "defrauded" of CTRs, i.e., of information, which is not a tangible economic right in any traditional sense.

tangible rights theory. We agree. In response, the government cites a truckload of cases which miss the point. They cite several cases, many of which we relied upon in our discussion of the conspiracy count, which essentially hold that a "scheme to defraud" is very broad under 18 U.S.C. § 371. This is true, as we held earlier, but § 371 does not contain a fiduciary duty requirement in intangible loss cases; the courts do not distinguish intangible loss cases from tangible loss ones in imposing liability. *See, e.g., Hammerschmidt,* 265 U.S. at 188, 44 S.Ct. at 512. The government also cites several of the CTR cases which we have alluded to earlier. But none of these cases involved wire fraud charges, and none therefore discussed the fiduciary duty requirement. In sum, the government does not cite, and we have not found, any case that imposes liability under an intangible rights theory in a wire fraud prosecution where no fiduciary duty existed. We decline to so broaden the wire fraud statute to cover this non-fiduciary case. In so holding, we concur with other courts which have imposed some limits on the statute and have dismissed indictments or overturned convictions in cases involving admittedly improper conduct, but no cognizable wire (or mail) fraud offense. *Freedman,* 568 F.Supp. at 456 (defendant's scheme involved no public officials and no fiduciary duty); *see also, e.g., United States v. Boffa,* 688 F.2d 919, 926–930 (3d Cir.1982) (scheme to deprive employees of NLRA rights is not within mail fraud statute); *United States v. Rabbitt,* 583 F.2d 1014, 1026 (8th Cir.1978) (state representative who received a 10% commission on architectural contracts not liable under § 1341 because receipt did not deprive citizenry of his honest and faithful services), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979).

The government argues that the "duty" defendants owed was the duty not to scheme to deprive the IRS of CTRs. We agree that the defendants owed this duty,

and for that reason we earlier upheld Counts I, III, V and VII of the indictment. But such a duty is not *fiduciary* duty. The duty under § 371 to not conspire to defraud the United States is simply the duty under any criminal statute to not violate that law. The government simply has failed to show that the defendants owed some *fiduciary* duty to the United States. And the government has failed to cite any *wire fraud* cases imposing liability where no fiduciary duty existed. The wire fraud counts, XI through XVI, are therefore dismissed.

### Vagueness of the Indictment

The defendants also argue that the indictment is impermissibly vague in violation of Fed.R.Crim.P. 7(c) and the Fifth and Sixth Amendments.[23] We disagree.

 Rule 7(c)(1) requires that the indictment contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." This rule is grounded in the Fifth Amendment guarantee of indictment by grand jury and the Sixth Amendment right to be informed of the nature of the charges. *See, e.g., United States v. Dorfman,* 532 F.Supp. 1118, 1124 (N.D.Ill.1981). The indictment must adequately inform the defendant of the charge against him so that he can prepare his defense; and it must establish a record for the purpose of ruling on a defense of double jeopardy should defendant be prosecuted again. *Id.; see generally Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). We must pay particular attention to the conspiracy count, Count I, since conspiracy theories can be very broad, and indictments must therefore clearly state what the alleged conspiracy involved. *See United States v. Shoup,* 608 F.2d 950, 956 (3d Cir.1979); *United States v. Porter,* 591 F.2d 1048, 1057 (5th Cir.1979).

---

**23.** In light of our holdings above, we restrict defendants' vagueness argument to the remaining counts of the indictment.

■ The indictment is long, and while it arguably alleges some unnecessary facts, it does adequately inform the defendants of the charges against them. Count I specifies a violation of 18 U.S.C. § 371, and in paragraph 2, tracks the language of that statute. "In general, an indictment is sufficient if it tracks the language of the statute which creates the offense, provided that the words of the statute set forth all of the elements necessary to constitute the crime." *Dorfman,* 532 F.Supp. at 1124–25 (and cases cited therein). Of course, the elements of a conspiracy charge under § 371 are an agreement to defraud and at least one overt act to further that agreement. The indictment details the scheme to "defraud" the government, as discussed earlier, and it lists numerous overt acts in furtherance of the agreement. We think the defendants can understand and meet these charges.

■ Similarly, substantive Counts III, V and VII are not vague. They identify three dates on which Pavlovic and Richter brought in more than $10,000 to the American National Bank and broke it into deposits of less than $10,000. They specify that a CTR was required to be filed under the relevant sections of the Bank Secrecy Act, and that defendants knowingly and intentionally made their deposits to cause the bank not to file the CTR. It alleges that these acts violated 18 U.S.C. § 2 combined with 31 U.S.C. §§ 5313 and 5322(b). Thus, the three counts specify the acts considered to be illegal and the statutes violated. As we held earlier in this opinion, the alleged crime in each count is breaking a sum of money into increments on one day, with the specific intent of causing the American National Bank not to file a CTR, and in fact causing the bank not to file a CTR. We think the counts are clear enough in their charge, and our reading above answers defendants' "questions about these charges."[24]

■ Much of the defendants' arguments in their brief do not really address the issue of vagueness, but instead address an issue of surplusage or prejudice.[25] Rule 7(d) permits the Court to strike "surplusage," that is, irrelevant, inflammatory and prejudicial allegations, from the indictment. However, where the information alleged is legally relevant, it is not surplusage. *See United States v. Climatemp, Inc.,* 482 F.Supp. 376, 391 (N.D.Ill.1979), *aff'd,* 705 F.2d 461 (7th Cir.1983), *cert. denied sub nom Fakter v. United States,* 462 U.S. 1134, 103 S.Ct. 3116, 77 L.Ed.2d 1370 (1983). The defendants complain first about the indictment's frequent use of the term "laundering" as a label for their alleged activities. Of course, "laundering" is not a crime, as defendants point out. But defendants are not charged with any such crime. The indictment defines "laundering,"[26] and while the defendants disagree with this definition, it is not unduly prejudicial, and we think appropriate jury instructions will eliminate any problems from the use of the term. Similarly, defendants complain about the narcotics references. As we already held in our opinion on sever-

---

24. In their Reply Brief, at 34–35, defendants list several possible interpretations of the charged crime: We think the three challenged substantive counts are clear in what they charge, corresponding to defendants' "interpretation" number two: the alleged crime is the multiple deposits of cash under $10,000 made at the same bank on one day, with the specific intent of causing the bank not to file a CTR. Counts III, V and VII clearly allege this crime with respect to the American National Bank transactions.

25. Defendants have reasserted many of the following arguments in a later-filed Motion to Strike. For the reasons set forth in our discussion below, the motion to strike is denied. It is so ordered.

26. The indictment defines "laundering" as "illegally secreting" cash. Defendants would restrict "laundering" to "the replacement of 'dirty' money for 'clean' money." Motion to Strike at 1 (we think defendants really meant to say the replacement of "clean" money for "dirty" money). While defendants' definition is probably more common, we do not find the government's definition prejudicial, so long as the term is defined to the jury. We instruct the parties to prepare an appropriate instruction, if the government plans on using this term at trial. The parties might also consider exploring alternative labels as a compromise, such as "secreting" or "hiding."

ance, references to narcotics will be excluded at trial, unless the government satisfies the Court that such references are relevant and not unduly prejudicial. Thirdly, defendants complain about the references in the indictment to the wiring of money to Switzerland. They are correct that no violations of foreign reporting provisions are alleged, but that is besides the point. Such evidence, while not necessary to the indictment itself, will be relevant at trial on the issue of defendants' intent and also as evidence of overt acts to complete the alleged conspiracy. Finally, the indictment's reference to the $1,000,000 transaction is also plainly relevant to the conspiracy count.

### Outrageous Government Misconduct in Violation of Due Process

In addition to the various grounds for dismissal discussed above, defendants Richter, Pavlovic and Mangovski move to dismiss the indictment on the basis that the charges contained therein were induced by outrageous government misconduct. For the reasons set forth below, this motion is denied.

The Supreme Court recognized the defense of governmental misconduct in violation of due process in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), a major entrapment decision. The Court stated that it "may some day be presented with a situation in which the conduct of the law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1642. This due process defense is to be distinguished from a defense based on entrapment. While entrapment "focus[es] on the intent or predisposition of the defendant to commit the crime," *Hampton v. United States*, 425 U.S. 484, 488, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976), the due process defense involves an objective review of the government's conduct. Five of the justices who decided *Hampton* took pains to differentiate the

two defenses, recognizing that no matter what the defendant's predisposition a separate due process defense might be made if the government's misconduct was sufficiently egregious.

The Seventh Circuit recently noted both the existence and the narrow scope of the due process defense. In *United States v. Kaminski*, 703 F.2d 1004 (7th Cir.1983), the Court of Appeals observed:

The Supreme Court has not yet given any content to the principle that governmental misconduct may bar prosecution even absent any other deprivation of defendant's constitutional rights. However, an examination of the post-*Hampton* cases decided by the courts of appeals indicates that due process grants wide leeway to law enforcement agencies in their investigation of crime. Assuming that no independent constitutional right has been violated, governmental misconduct must be truly outrageous before due process will prevent conviction of the defendant.

*Id.*, 703 F.2d at 1009. *See also United States v. Thoma*, 726 F.2d 1191, 1198 (7th Cir.1984), *cert. denied*, —— U.S. ——, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984).

The nub of defendants' due process claim in this case is that the crimes charged were completely invented by law enforcement agents. Defendants state that they "believe that the evidence will show that law enforcement agents had no reason to suspect these defendants of having previously been involved in any kinds of crimes." Thus, it is argued that, rather than infiltrating existing criminal activity, the government allegedly manufactured new crimes merely for the sake of pressing criminal charges. Apparently to strengthen their claim that the government's conduct was outrageous, defendants also assert that the agents disregarded their own agency guidelines which prevent undercover operations from investigating corruption where the agents have no evidence that crimes have previously been committed.[27]

The government's initial response is that rather than determining the validity of the

---

**27.** Even if the agents did violate agency guide- lines in conducting their investigation, defend-

due process defense before trial, the Court should allow the question to be submitted to the jury. However, most of the courts which have considered this aspect of the due process defense have held that the existence of outrageous government conduct is a question of law and thus may be properly raised in a pretrial motion to dismiss. *See, e.g., United States v. Valdovinos-Valdovinos*, 588 F.Supp. 551, 554–55 and n. 6 (N.D.Cal.1984), *rev'd on other grounds*, 743 F.2d 1436 (9th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 799, 83 L.Ed.2d 791 (1985), and cases cited therein.

Even though this is a question of law, the Court is precluded from deciding the issue at this time because of certain material factual disputes. Controverting defendants' suggestion that the law enforcement agents had no reason to suspect them of any previous criminal activities, the government asserts that defendant Konstantinov introduced the agents to the other defendants,[28] indicating that they could help the agents launder drug money as they had performed a similar function for him in the past. The government portrays the investigation that led to this indictment as an offshoot of a narcotics investigation, not as a perverse scheme solely designed to create unprecedented crimes from a "peculiar piece of legislation," as defendants term the Bank Secrecy Act. Also relevant to defendants' due process defense is the degree to which the law enforcement agents planned and insisted upon the money laundering scheme. Defendants claim that they encouraged the agents to invest in real estate, but the agents urged them to take steps to violate the Bank Secrecy Act; the government, on the other hand, credits the defendants with engineering the details of the money moving operation. In light of these unresolved questions, the Court is presently unable to rule as a matter of law that defendants have a valid due process defense.[29] Accordingly, defendants' motion to dismiss the indictment must be denied at this time.[30]

## Conclusion

For the above reasons, Counts XI–XVI of the indictment are dismissed. In all

ants' due process claim is not bolstered. The Seventh Circuit stated in *Thoma* that "whether the investigators violated their own self-imposed standards or procedures is irrelevant to the determination whether defendant's rights were violated as these standards do not grant defendant any rights." *Thoma*, 726 F.2d at 1199 n. 3 (citations omitted). Defendants therefore do not need to review the agents' undercover operations reports in order to fully prepare their due process defense.

In the reply brief supporting their motion to require production of undercover operations data, defendants also assert their need for these reports in order to prepare an *entrapment* defense. As we have already noted, entrapment focuses on a defendant's predisposition, his "state of mind *before his initial exposure to government agents.*" *United States v. Jannotti*, 501 F.Supp. 1182, 1191 (E.D.Pa.1980), *rev'd on other grounds*, 673 F.2d 578 (3d Cir.1982), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982) (emphasis added). However, even if some of the reports sought by defendants might indicate indirectly the defendants' predisposition, the reports are not discoverable. In the first place, defendants' discovery request is very broad—the government cannot be faulted for characterizing it as a "fishing expedition." Moreover, the request runs afoul of Fed.R. Crim.P. 16(a)(2), which excludes from discovery "reports, memoranda, or other internal government documents made by the attorney for the government *or other government agents* in connection with the investigation or prosecution of the case ..." (emphasis added). *See also United States v. Goldman*, 439 F.Supp. 337, 350 (S.D.N.Y.1977). Accordingly, the motion to require production of these reports is denied. It is so ordered.

28. Specifically, the government claims that Konstantinov led the agents to Pavlovic, who in turn introduced the agents to Richter and Mangovski.

29. The government also argues that even if the law enforcement agents had no reason to believe that the defendants had ever been involved previously in criminal activity, the defendants' due process defense must fail. In support of this argument, the government cites several *entrapment* cases which unfortunately miss the mark. Given the uncertainty at this stage about the degree of government participation in defendants' allegedly criminal conduct, we are unwilling to accept the government's alternative argument.

30. Defendants, of course, may raise this issue once more at the close of their trial, in a motion for a directed verdict, if they believe the evidence supports their defense.

other respects, defendants' motions to dismiss and their satellite motions are denied. It is so ordered.[31]

---

**31.** Jury selection will commence as scheduled on April 15, 1985, at 10:00 a.m. Proposed voir dire questions should be submitted to the Court in writing on or before April 10, 1985.

Prior to April 12, 1985, all counsel shall meet to prepare stipulations as to uncontested facts and foundation material. Defense counsel shall also meet among themselves and develop procedures to avoid the presentation of cumulative examinations.

Testimony in this case will be taken on Mondays through Thursdays. However, as previously discussed, tape recordings will be played to the jury on Fridays. All counsel shall meet prior to April 12, 1985, and attempt to prepare an agreed order and jury instruction which will provide for the jury to hear the extensive tape recordings to be offered into evidence on Fridays without requiring the physical presence of the Court and counsel during these tape-playing Friday sessions.

Counsel shall report to the Court at its status call on April 12, 1985, at 11:00 a.m. as to the results of the foregoing meetings. A status hearing has previously been ordered for April 9, 1985. In light of the schedule and directions set forth in this footnote including an April 12 status hearing, counsel are promptly to advise the clerk, Mark Tortorici, as to whether they still desire that the April 9 status hearing be held. It is so ordered.